# Evans v. Reading Chemical Fertilizing Co., Ltd., Appellant.

*Nuisance—Injunction—Bone-boiling establishment.*

An injunction will be awarded restraining the operation of an establishment for the manufacture of fertilizers out of the carcasses of dead animals and butchers' refuse, where the evidence shows that the establishment was in a populous neighborhood, and that the gases which it gave off caused nausea, vomiting and loss of appetite, and rendered plaintiff's house undesirable as a place of residence, and depreciated its market value.

Argued Feb. 26, 1894. Appeal, No. 388, Jan. T., 1893, by defendant, from decree of C. P. Berks Co., equity docket 1891,

No. 547, in favor of plaintiff, Hannah Evans, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and FELL, JJ.  Affirmed.

Bill in equity for injunction to restrain operation of establishment for making fertilizers out of carcasses of dead animals and butchers' refuse.

The case was referred to Horace A. Yundt, Esq., as master, who reported the facts as follows:

"Hannah Evans, the plaintiff, is the owner of a two story brick and stone dwelling house, and tract of land, upon which the same is erected, situate in Spring township, Berks county, Pennsylvania, adjoining the Berks and Dauphin turnpike road, and lands now or late of Benneville Hiester, Dr. H. H. Muhlenberg, Thomas Yost and Allen Van Steffy, containing thirty acres and ninety-one perches, she having acquired title to the same on February 9, 1880, under proceedings in partition upon the estate of her deceased father, John V. R. Evans, to whom it was devised by her grandfather, Philip T. Evans, in 1835.  She was born there, and has occupied and used the premises ever since she became the owner, farming it herself with the assistance of a hired man, who, with his wife, lived in the same house with her until April 1, 1891, when her brother, Miller D. Evans, moved into the house with his family, consisting of his wife and two children, and a servant girl, and he has been farming this land for her ever since.  This dwelling house is situated along the Berks and Dauphin turnpike road, a public highway much used, and is about two and a half miles from the city of Reading, and a little over a mile from the village of West Reading by said road, and about the same distance by the same from the village of Sinking Spring, which has a population of about six hundred.  The Lebanon Valley railroad crosses the turnpike a short distance above the house.

"The Reading Chemical and Fertilizing Company, Limited, the defendant, is a limited copartnership, organized under the act of June 2, 1874, composed of Albert Thalheimer, Wilson B. Angstadt and K. H. Cleaver, and engaged in the business of manufacturing fertilizing materials in a building situated along the Lebanon Valley Railroad and about sixty or eighty feet from the Berks and Dauphin turnpike, in said Spring

township, on a tract of land belonging to the defendant and containing about forty-two acres.

"This building is about one hundred and eighty feet long and about forty feet wide, and about one half of it is three stories in height; it is about eighty yards from the plaintiff's land and about five hundred and forty yards from her dwelling. The dwelling nearest to the manufactory is about one hundred yards away and is on the defendant's land and occupied by its tenant; the next building is the plaintiff's dwelling and a few hundred feet beyond that is a public schoolhouse. Several other families live in the immediate neighborhood but further from the manufactory. [It is a populous farming district,] [1] the average size of the farms being about one hundred acres. In March, 1891, the defendant began to manufacture fertilizing materials at this place, and has continued to carry on the business ever since. The materials used are the carcasses of animals that have died of disease or been killed, bones, blood, flesh and entrails, and are received by the defendant from the butchers, farmers and scavengers. Materials in an advanced state of decomposition are not received or used. Butchers' offal is taken there in sealed cans soon after the animals are slaughtered, and carcasses, soon after the animals have died or been killed, are delivered in open wagons. These materials, after the skins are removed from the carcasses, are cut up and placed in a large steel boiler called a digester, which is about eight or ten feet high and five feet wide, and are there subjected to a temperature of from 250 to 400 degrees Fahrenheit, and boiled from three to five hours. The digester is covered with a lid so constructed as to make it tight and prevent the escape of the steam. There is no fire under the digester; the heat is applied by means of a steam pipe. The steam is generated in a large boiler, with a pressure usually of eighty pounds, and is conveyed from there in pipes. When the materials are thoroughly boiled, the steam is turned off and the digester cools in six or eight hours. The gas that is generated in the boiling process is conducted into a tank of water. The fat or grease on top of the boiled material is removed to a tank or kettle through a pipe by means of steam being forced under it and blowing it off, and this steam is carried into a tank of water and condensed. The water under the fat in the digester

is then pumped into another tank and the solid material is re-moved to the upper floor, dried, ground, run over screens, mixed with different acids, among them sulphuric acid, and put in sacks for the market. Fourteen men are employed in the manufactory, and the capital invested there is $35,000.

" The most improved machinery and appliances and the best processes known to the business are used and employed by the defendant. But [notwithstanding all these precautions, an offensive and disagreeable odor or stench is almost constantly generated and emitted from this manufactory and carried by the winds for a distance of a mile or two over the surrounding country, its intensity and presence in the different parts of the neighborhood at various times depending upon the distance from the factory, the condition of the atmosphere, and the direction of the winds.] [2]    At the plaintiff's house it is sometimes exceedingly offensive, at other times less disagree-able, but nearly always noticeable. This stench is, no doubt, caused to a large extent by the gas that is generated in mixing the dried materials with acids, and also in some degree by the vapors that escape in the boiling and separating process, and while it probably does not cause any serious disease, or injuri-ously affect the workmen in the factory who are accustomed to it, yet it is offensive and disagreeable to people generally who inhale it, and causes nausea, vomiting and loss of appetite, and renders the plaintiff's house much less desirable than for-merly as a place of residence; and, to that extent, depreciates its market value. So great is the physical discomfort to the plaintiff and her family, that they are no longer able to enjoy the premises as they did before the erection of this manufac-tory, and their condition there is exceedingly uncomfortable."

After considering the legal proposition, the master begs leave to submit the following conclusions of law :

" [The business in which the defendant is engaged, when carried on in a populous neighborhood, has been decided by the courts in Pennsylvania to be a nuisance per se,] [3] and liable to be restrained by injunction.

" The business of boiling up the carcasses of dead animals in a thickly populated neighborhood, which causes an offensive smell, is per se a nuisance, and may be enjoined against : Smith v. Cummings, 2 Parsons's Equity Cases, 92.

"No one will for a moment doubt that we are invested with ample powers to restrain the erection of any building or structure intended for a purpose which will be a nuisance per se, such as bone-boiling, horse-boiling establishments, swine yards or pigstys and other various like establishments. These not only interfere with the health, but, if they do not reach to that, they do to the usual and ordinary enjoyment of the residences of inhabitants coming within the circle of atmosphere tainted by them, and both property and persons may be prejudiced or injured thereby. The right to claim that such establishments shall be prevented is the right that every citizen has to pure and wholesome air, at least as pure as it may be, consistent with the compact nature of the community in which he lives: Rhodes v. Dunbar, 57 Pa. 286.

"If the business is a nuisance per se, no doubt can exist in regard to the remedy by injunction: Dennis v. Eckhardt, 3 Grant, 392. No one doubts the jurisdiction of a court of equity in the case of a nuisance per se, such as a bone-boiling establishment, a swine yard, or a pigsty, or other similar establishments: Newcastle v. Raney, 130 Pa. 546. In the case of Czarniecki v. Bollman, 10 Cent. R. 96, and 18 Pitts. L. J. N. S. 153, the plaintiff, being the owner of real estate in Allegheny county, Pennsylvania, situated from 330 feet to 1800 feet from the defendant's property, filed a bill asking for an injunction to restrain the defendant from erecting buildings and using the same for carrying on the business of boiling bones and the carcasses of horses and other animals. The court below awarded the injunction, because the business was a nuisance per se, and the Supreme Court of Pennsylvania, on November 11, 1887, affirmed the decree, saying: 'We concur with the court below, so far as its injunction restrains the defendants from using the proposed buildings as a bone-boiling establishment, for every one knows that carrion cannot be gathered together in any populous neighborhood without being offensive. But the erection of the buildings themselves cannot be regarded as a nuisance; and we must, therefore, direct a modification of the injunction so far as it regards such erection and no farther.'

"The same rule has been applied to a similar business in New Jersey: Meigs v. Lister, 23 New Jersey Equity Reports, 199.

"The difference between a nuisance per se, and where a law-

ful business is carried on so as to become a nuisance, is not in the remedy but only in the proof of it: Dennis v. Eckhardt, supra. In the one case the wrong is established by proof of the mere act; in the other, by proof of the act and its consequences.

"Testimony having been submitted by the plaintiff to prove the act, the burden is upon the defendant to show that it is not such a nuisance, that it does not produce odors and stenches which are offensive and disagreeable to the plaintiff and her family and to other persons in the neighborhood who are obliged to inhale them, and which impair their physical comfort and interfere with the enjoyment of their property, and that it is not a populous neighborhood. This the defendant has failed to do. That disgusting and unwholesome stenches are produced in this manufactory and carried over the surrounding neighborhood and into the plaintiff's house, and that it is a thickly settled farming district has been clearly established by the evidence. That the defendant has made every reasonable effort to prevent the escape of these vapors and stenches is, no doubt, true, and that he has not succeeded is probably because science has not yet invented the machinery and appliances by which it can be prevented."

Exceptions were (1–3) to above findings as in brackets, (3) in not finding remedy at law adequate, (4) in not finding that plaintiff has suffered no special injury, and (5) in recommending decree, quoting findings and decree.

The court overruled exceptions and entered decree, as quoted in opinion of Supreme Court, in an opinion as follows, by ENDLICH, J.:

"Every man has the right to the natural use and enjoyment of his own property, and if, whilst lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is damnum absque injuria: Pa. Coal Co. v. Sanderson, 113 Pa. 126, 146. The context of the opinion in which this utterance occurs, shows that natural use and enjoyment means such development of its resources, and such customary and appropriate employment of the property itself as is needful for its complete utilization, according to its inherent qualities or contents and its surroundings, and does not include, in any other case, the bringing upon it, arti-

ficially, of substances not naturally found there.   The complement of this rule is, that, as to anything beyond such natural use and enjoyment of his property, without negligence or malice, every citizen holds his property subject to the implied obligation that he will use it in such way as not to prevent others from enjoying the use of their property: State v. Yopp, 97 N. C. 477; 2 Am. St. R. 305.   Sic utere tuo ut alienum non lædas,—a rule approved and applied in Dennis v. Eckhardt, 3 Gr. 390; Howell v. McCoy, 3 Rawle, 256; Hutchinson v. Schimmelfeder, 40 Pa. 396; Pa. Lead Co.'s Ap., 96 Pa. 116; Pa. Coal Co. v. Sanderson, 113 Pa. 126, and a multitude of other cases.

" A use of his property by one in excess of the limitations resulting from the conjoint operation of these principles, must, if continuous (Sparhawk v. Ry. Co., 54 Pa. 401, 421) and injurious, i. e., accompanied by damage (Rhodes v. Dunbar, 57 Pa. 274, 291) of a substantial character (Price, v. Grantz, 118 Pa. 402, 413) necessarily be a nuisance : Dennis v. Eckhardt, supra, page 391.   If it is such to the right of the public at large, it becomes a crime ; if to the rights of individuals only, or specially to them in addition to and distinct from the public offence (Sparhawk v. Ry. Co., supra; Bunnell's Ap., 69 Pa. 59), it creates a liability for compensation, and, under certain conditions, to equitable restraint.   The fact that the maintenance of a nuisance is a crime does not deprive courts of equity of the power to abate it: Ibid., Pa. Lead Co.'s Ap., supra; Carleton v. Rugg, 149 Mass. 550; Ewell v. Greenwood, 26 Iowa, 377; Minke v. Hopeman, 87 Ill. 450; 29 Am. R. 63. For when a private injury results from a breach of a public law, the public wrong may be redressed by the private remedy, because the private remedy stops the wrongdoer: Sparhawk v. Ry. Co., supra, p. 422.   Since, however, equity will not interfere except where the plaintiff's right to its intervention is free from doubt (Ibid., p. 426), i. e., where a wrong and a resulting injury accompanied with damage recoverable at law are manifest (Rhodes v. Dunbar, supra, pp. 290, 291), or certain to follow (Wier's Ap., 74 Pa. 230), there is, in respect of the application of equitable remedy by injunction a clear distinction (pointed out by WESTBURY, L. C., in Smelting Co. v. Tipping, 11 H. L. Cas. 642; 116 E. C. L. 1093) between those acts

which produce material injury to property and those which are
productive of sensible personal discomfort only.   In cases in-
volving the latter — personal inconvenience and interference
with one's enjoyment, one's quiet, one's personal freedom, any-
thing that discomposes or affects the senses or nerves,—the
right to relief must depend largely upon the circumstances of
the place where the thing complained of occurs.   It is reason-
able and necessary that persons living in a community and
neighborhood should subject their personal comforts to the con-
sequences of those operations, trades and businesses that are
carried on in the immediate locality and are actually necessary
for trade and commerce, for the enjoyment of property and for
the benefit of the inhabitants and of the public at large.   But
when an occupation is carried on by one person in the neigh-
borhood of another, and the result of that trade or occupation
or business is a material injury to the property, then there un-
questionably arises a very different consideration, and ' in cases
of that description the submission which is required from per-
sons living in society to that amount of discomfort which may
be necessary for the legitimate and free exercise of the trade
of their neighbors would not apply to circumstances, the im-
mediate result of which is sensible injury to the value of the
property:' per WESTBURY, L. C., ubi supra, approvingly cited in
Cooley, Torts, 597.   Hence, whilst an invasion by one's use of
his property of the personal rights, comforts, etc., of his neigh-
bor may become the ground for chancery interference, yet,
where this is the ground of complaint, the kind and extent of
those personal rights and the question whether it is at all these
rights or merely idiosyncrasies or preferences that are involved,
depending so much upon the surroundings, upon the usual
pursuits of men in the neighborhood, upon the consequent
necessities of others in the customary and reasonable enjoy-
ment of their property, upon the public needs of the locality,
and the like, a chancellor cannot, with good conscience, de-
clare the complainant's case to be free from doubt, and will
therefore refuse a decree, at least until that doubt is set at rest
by an action at law and the verdict of a jury, which, as was
substantially held in New Castle v. Raney, 130 Pa. 546, and
Com. v. Miller, 139 Pa. 77, is peculiarly capable of determin-
ing such questions.   On the other hand, where the wrong com-

plained of is an injurious invasion of a property right, fixed and determined by the law, and depending upon no such shifting and uncertain elements as those which must be regarded as affecting one's personal right of comfort, quiet, etc., in any given neighborhood, chancery is competent to act, and in proper cases must act, in order to preserve the constitutional rights of property owners; for, as is well said in Hennessey v. Carmony (N. J.), 25 Atl. R. 374, 378, to refuse equitable relief in such cases and remit the complainant to his remedy at law would be, in effect, 'giving the wrongdoer a power not permitted by our system of constitutional government, viz., to take the injured party's property for his private purposes upon making, from time to time, such compensation as the whims of a jury may give.'

" I think this distinction, whilst not explicitly applied by our Supreme Court as a ratio decidendi in any chancery case that has come under my observation, is, nevertheless, abundantly sustained by an examination of its decisions. Thus, in Sparhawk v. Ry. Co., 54 Pa. 401, the alleged nuisance consisted of the rumbling of the street cars in the city of Philadelphia, causing mental discomfort to the complainant. The injunction prayed for was refused in part because the discomfort was of a mere personal character, incident to the surroundings. In Richards's Ap., 57 Pa. 105, the facts found showed the use of a fuel in defendants' works which polluted the air with soot and smoke, annoying, in certain conditions of the atmosphere, the occupants of plaintiff's house and the operatives in his factory, and to a slight extent injuring his buildings (p. 108). This injury was such as to be deemed capable of compensation at law, and wholly inadequate to warrant a destruction of the defendant's business; and the former, being a mere personal inconvenience, inseparable from a manufacturing neighborhood, insufficient to ground an injunction. In Rhodes v. Dunbar, 57 Pa. 274, an injunction was sought against the erection of a building for a certain purpose, on the grounds of (*a*) probable pollution of the air by soot and smoke, (*b*) likelihood of personal discomfort resulting to complainant from the noise of the proposed business, and (*c*) apprehension of danger to neighboring buildings from fire capable of being communicated to them in the event of the objectionable structure being burned. In

the absence of all proof of actual present, or certain future damage, it was held that the first of these grounds could constitute only a personal annoyance or inconvenience of a kind incident to the surroundings;. the second, clearly of the same character, was unsustainable by the proof; and the third, being a mere apprehension, speculative, eventual and contingent, could not form the basis of equitable interference, even conceding the tendency of the possible prospect of danger from fire to diminish the value of complainant's property by increasing the rate of insurance, because 'mere diminution (of value), irrespective of any direct damage, is not a ground for injunction' (p. 290). Accordingly, the latter was refused. Huckenstine's Ap., 70 Pa. 102, is another case in the same line. The allegation of injury to plaintiff's property was considered disproved, or at least too doubtful, under the evidence, to be of any weight. The remainder of the bill relied upon the annoyance arising from the smoke of brick kilns upon the outskirts of Allegheny City, 'whose every day cloud of smoke from thousands of chimneys and stacks hangs like a pall over it, obscuring it from sight,' (p. 107,) with which ' the heat, smoke and vapor of a brick kiln cannot compare ' (p. 106). This was held personal discomfort to which the complainant, in common with others who live there, had voluntarily subjected himself. It is to be observed that this decision, as well as that in Rhodes v. Dunbar, supra, and in the later case at law of Price v. Grantz, 118 Pa. 402, largely relies upon and cites from Smelting Co. v. Tipping, supra. In McCaffrey's Ap., 105 Pa. 253, the bill went no further than to allege annoyance and discomfort from noise and vibration caused by defendant's machinery. The vibration was disproved except as arising from the passage of vehicles in the street. The noise was shown to amount to little more than ' the breakers on a distant beach.' The place was in the heart of a large city. Of course there was no injunction.

" Passing from these cases, sufficient for the purpose of illustration, to those in which injury to property rights was shown, we find very different results, remembering that the right of private property ' consists in the free use, enjoyment and disposal of all acquisitions, without any control or diminution save only by the laws of the land' (Hutchinson v. Shimmelfeder,

40 Pa. 396, 398), and that by injury to property is meant 'something materially affecting its capacity for ordinary use and enjoyment:' Sparhawk v. Ry. Co., supra, p. 426.   Thus in Dennis v. Eckhardt, 3 Gr. 390, the maintenance of a shop by a tinsmith and sheetiron worker, the noise of the hammering and pounding in which made it impossible for the plaintiff to enjoy his property without danger to the health of himself and family, was enjoined.   Of the same character is the Ladies' Decor. Art Club's Ap., 12 Cent. R. 377.   In Pa. Lead Co.'s Ap., 96 Pa. 116, an injunction issued on proof that the smoke and vapors from the defendant's establishment settling upon the plaintiff's land, lessened its fertility, poisoned its vegetation, destroyed animals grazing upon it, nauseated its inhabitants and diminished its value for selling and renting.   In Wier's Ap., 74 Pa. 230, the erection of a powder-house was restrained, without proof of antecedent damage, but to prevent further injury certain to result to complainant's property by making its enjoyment unsafe and depreciating its value.   In Czarniecki v. Bollman, 10 Cent. R. 96, defendants were enjoined from using their building for the purpose of boiling bones and carcasses of horses and other animals in the manufacture of neat's foot oil and fertilizers, on the allegation that the smoke, gases, vapors and stenches resulting from these operations would injure the health and comfort of plaintiffs upon their property and depreciate the value of the latter.   Again, in Rhodes v. Dunbar, supra, it is said at page 290, that certain establishments, such as powder magazines, nitroglycerine depots, may be enjoined, not only on the ground of their liability to fire, primarily or even secondarily, but on account of the injury with which they menace alike property and persons in their vicinity.   It is needless, however, to multiply decisions and dicta to the same general purpose.   The rule seems clear that, as soon as a court of equity comes to deal with injuries to property rights, the decision proceeds upon a different plan from that upon which mere personal discomfort and annoyance stand.   As to the treatment of these respective classes of cases in courts of law, the same distinction is unmistakably announced by Mr. Justice WILLIAMS in the very recent case of Robb v. Carnegie, 145 Pa. 324, 340, in these words: 'If the individual is thereby deprived of his property without fault on his part, he is entitled to compensation; but if he is

affected only in his tastes, his personal comfort or pleasure, or preferences, these he must surrender for the comfort and preferences of the many.' Where, however, he is entitled to compensation at law, there, if the injury be continuous and remediable at law only by a multiplicity of suits, that is to say, irreparable at law, (Pa. Lead Co.'s Ap., 96 Pa. 116, 123), equity will intervene for his protection by exercising its restraining powers: Sheetz's Ap., 35 Pa. 88, 95; Dennis v. Eckhardt, 3 Gr. 390, 392; Pa. Lead Co.'s Ap., supra, p. 124; Haugh's Ap., 102 Pa. 42, 45; Bitting's Ap., 105 Pa. 517, 521; Hennessey v. Carmony (N. J.), 25 Atl. R., 374, 377. That is the very test and foundation of chancery jurisdiction.

" But it is contended by defendant's counsel, (1) that in every case a decree of injunction is not of right, but of grace, discretionary; (2) that it will not be granted, even where injury to property rights is made out, if it appears that the injury proceeds from the conduct (*a*) of a lawful business, (*b*) without negligence, i. e., with the most approved appliances; and (3) that it will not be granted where (*a*) the loss which would result to its owner, or (*b*) the inconvenience which would result to the public from a destruction of that business would be greater than the injury resulting to the plaintiff from its continuance.

" (1) It was said by Mr. Chief Justice THOMPSON, in Richards's Ap., 57 Pa. 105, 113: ' An error seems somewhat prevalent in portions, at least, of this commonwealth, in regard to proceedings in equity to restrain the commission of nuisances. It seems to be supposed, that, as at law, whenever a case is made out of wrongful acts on the one side, and consequent injury on the other, a decree to restrain the act complained of must as certainly follow, as a judgment would follow a verdict in a common law court. This is a mistake. It is elementary law, that in equity a decree is never of right, as a judgment of law is, but of grace.' The same thought is repeated by Mr. Justice AGNEW in Huckenstine's Ap., 70 Pa. 102, 106. Speaking of the intervention of chancery by injunction in cases of nuisance, he says: ' The aid is not of right but of grace.' Similar observations are to be found frequently enough in decisions of our own and other courts, as well as in text-books. That they embody an unquestionable principle of equity jurisprudence

cannot be disputed.    But what is that principle?    It certainly
cannot be that a chancellor has the right of acting, in the final
settlement of property rights, according to his arbitrary will,
uncontrolled by the legal and equitable rules governing those
rights.    It was said by the late Mr. Justice WOODWARD, while
president judge of this district, that ' In the administration of
justice, there is nothing that properly could be deemed discre-
tion.    Mere discretionary power has always been mere despot-
ism.    In all subjects, some established and recognized principles
control the courts:' Report of Co. Auditors, 1 Woodw. 270,
272.    At any rate the true scope of the exercise of discretion
in the judicial field, understood as referring to a power to give
or withhold at will, ' is found in those matters which affect
procedure merely, and not the ultimate rights:' Hennessey v.
Carmony (N. J.), 25 Atl. R. 374, 379.    If, on the other hand,
it is intended to be laid down, that a chancellor, applied to for
a final injunction restraining the continuance of a nuisance,
must be discreet, must act with discretion, must discriminate,
must take into consideration and give weight to each circum-
stance in the case, in accordance with its actual value in a court
of equity, then it is plain that that is just what he must do in
every case coming before him for determination (Ibid.), whether
it be a case of nuisance, of reformation of an instrument, of
specific performance, or what not.    It is very clear to me that,
wherever, in the decisions of our Supreme Court, reference is
made to the grace, or discretion of the chancellor as to the
granting or withholding of a final decree, this is the kind of
discretion intended.    The circumstances under which, in the
cases above cited, the decree was said to be a matter of grace,
show that such was the intention—circumstances which have
been explained above and shown to have brought the applica-
tions within the rule denying injunctions on the ground of mere
personal inconvenience.    And so does the language of Mr. Jus-
tice GORDON, in Pa. Lead Co.'s Ap., 96 Pa. 116, 124, where he
approvingly cites that of EARL, J., in Campbell v. Seaman, 63
N. Y. 568, concerning right to an injunction in equity in cases
of nuisance without previous proceedings at law, as follows:
' The writ can rightfully be demanded to prevent irreparable
injury, interminable litigation, and a multiplicity of suits, and
its refusal in a proper case would be error to be corrected by

an appellate jurisdiction.   It is a matter of grace in no sense
except that it rests in the sound discretion of the court,' add-
ing thereto : 'Nor have our courts been less ready to adopt the
same doctrine.'

"(2) At least as far back as Alfred's Case, 9 Rep. 103, every
nuisance brought into a court of justice has been sought to be
excused on the ground that the injury complained of resulted
from the reasonable prosecution of a lawful business, and ought
therefore to be borne by the plaintiff without a murmur.
(*a*) It is not quite easy to understand the precise force of the
term 'lawful' as used by defendants in this connection.   If it
is used in opposition to unlawful, prohibited by law, criminal,
it does not seem to be very pertinent; for it is decided that a
private plaintiff cannot supplement a defective case by an al-
leged infraction of the penal laws in the acts complained of:
Sparhawk v. Ry. Co., 54 Pa. 401.   If, however, the fact that
a business complained of as a nuisance is unlawful in this
sense counts for nothing in his favor, how can the fact of its
being not so unlawful count against him?   This, therefore,
cannot be the meaning of the term 'lawful' as used in those
decisions which emphasize the extreme caution to be observed
in the exercise of a chancery power that may strike down a
'lawful' business or industry.   Its significance lies in its char-
acterization of the business complained of as affecting the indi-
vidual complaining, and not the public.   In Wier's Ap., 74 Pa.
230, the erection of a powder-house was restrained as a nuisance.
In Dilworth's Ap., 91 Pa. 247, a decree enjoining the erection
of a powder-house as a nuisance was reversed.   The test was
in neither the inherent lawfulness nor unlawfulness of the busi-
ness, but its lawfulness in the one locality and its unlawfulness
in the other, measured by its effect upon the plaintiff's property
rights.   No court, at this day, apart from legislative declara-
tion, would undertake to pronounce any useful industry or
manufacturing enterprise unlawful under all circumstances, ir-
respective of locality or surroundings.   But in certain locali-
ties and surroundings the common experience of mankind, of
which courts take judicial notice, has found certain pursuits
to be universally injurious to health and damaging to prop-
erty, no matter how carefully conducted.   Hence, in such
neighborhoods, those pursuits are declared to be nuisances

per se; i. e., in themselves nuisances, and not nuisances only if improperly carried on. Such businesses in such localities are prima facie unlawful, because prima facie nuisances to nearby property holders. Others are prima facie lawful, because not necessarily attended with such effects, and must be shown to be conducted in such a way as to become nuisances. Thus, the difference between the two kinds of nuisances is in the method of proof only. Dennis v. Eckhardt, 3 Gr. 390, 392. The lawfulness or unlawfulness of either is still predicated upon its effects on the plaintiff's property rights. Hence, an appeal to the chancellor not to restrain an enterprise because it is a lawful one, is simply another way of asserting that it is not a nuisance, per se, or under the facts; and to say that a chancellor will not restrain a lawful business is to say that he will not restrain that as a nuisance which is not a nuisance.

" (b) As to the use of approved appliances, all that need be said is that, whilst the employment of inferior methods may render unlawful prosecution of business otherwise unobjectionable (Demarest v. Hardham, 34 N. J. Eq. 469; Yocum v. Hotel St. George Co., 18 Abb. N. C. (N. Y.) 340; Richards' Ap., 57 Pa. 105, 112), it is very clear that the adoption of the 'most approved methods known to science, or which human·skill has devised,' will not justify that which is not a 'natural use and enjoyment of one's property, and which, in spite of those methods, remains a nuisance: Pa. Lead Co.'s Ap., 96 Pa. 116, 127.

" (3) In Richards's Ap., 57 Pa. 113, 114, the court says: ' The chancellor will consider whether he would not do a greater injury by enjoining them than would result from refusing, and leaving the party to his redress at the hands of a court and jury. If in conscience the former should appear, he will refuse to enjoin.' And in Dilworth's Ap., 91 Pa. 247, 250, it says: ' It often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that the complaining party should be left to his remedy at law.' Like expressions are to be found in other cases. None of them, nor all of them, can be authority for the proposition that equity, a case for its cognizance being otherwise made out, will refuse to protect a man in the possession and enjoyment of his property because that right is less valuable to him than the power to destroy it may be to his neighbor or to the public.

" (a) So far as the ' balance of injury ' notion refers to the parties of the litigation, it is pointed out in Higgins v. Water Co., 36 N. J. Eq. 538, 544, that its legitimate application is to motions for preliminary injunctions, not to final decrees. Where the question for the consideration of the court is as to the propriety of stopping a business by preliminary injunctions, upon an ex parte showing, which may or may not be substantiated by further examination of the case in due course, it is very well for a chancellor to take into account the magnitude of the defendant's investment and compare it with the character of the plaintiff's alleged injury, and if the latter appears trifling beside that which would result from the impairment of the former, he may well refuse to exercise his power until more fully advised. But where, upon final hearing the mind of the chancellor is satisfied that the complainant's right is clear, and the injury sustained by him substantial, so that his claim to damages at law is indisputable, and where, moreover, such damages could not give him adequate redress except by an endless repetition of suits, a refusal of an injunction, upon the ground that plaintiff cannot suffer as great a loss from the continuance of the nuisance as defendant would from its interdiction, would be as far removed from equity as can be. There is to my mind no more offensive plea than that by which one seeks to justify an act injurious to his neighbor on the ground of its advantage to himself. ' A person cannot go on and build extensive works and make heavy expenditures of money for the exercise of a trade or business that will invade the premises of another : . . . and then, when called upon to desist, turn around and claim immunity for his trade or business upon the ground that to stop it would involve him in ruin. . . . Where justice is properly administered, rights are never measured by their mere money value, neither are wrongs tolerated because it may be to the advantage of the powerful to impose upon the weak : ' Pa. Lead Co.'s Ap., 96 Pa. 116, 127, per GORDON, J. Wherever, in this state, a final decree of injunction against an alleged nuisance has been refused with a reference to the ' balance of injury ' doctrine, as applied to a comparison of the plaintiff's injury with the defendant's investment, it will be found that, as in Richards's Ap., supra, the former was such as to be capable of adequate compensation at law.

" *(b)* So far as this doctrine refers to the interest of the public, its significance, as shown by the circumstances under which it has been applied, is exhausted, except in applications for preliminary decrees by the rule already stated concerning the duty of the individual to subordinate his personal preferences to the necessities of the community in which he lives, and for its good to put up with those ' mere trifling annoyances or injuries ' referred to in Price v. Grantz, 118 Pa. 402, 413, which consist solely in personal inconvenience. I have not been able to find a case in which substantial injuries to property rights, to the rights of enjoying and possessing property, have been sanctioned by a final refusal to enjoin, on the mere ground that the public was interested in their continuance. Such an appeal was made in Broadbent v. Gas Co., 7 De. G. M. & G. 436. It was said that the undoubted injury inflicted upon the plaintiff's property was slight in comparison with the manifest benefits conferred by the company on the public, and on that account the court ought not to exercise its powers to restrain the manufacture of gas. But Lord CRANWORTH said : ' I have come to the conclusion that I cannot enter into any question of how far it might be convenient for the public that the gas manufacture should go on,' adding that, in the face of substantial continuing damage, to deny an injunction upon such a ground and remit the plaintiff to an action at law toties quoties, ' would be a disgraceful state of the law.' The judgment in this case was affirmed on appeal : 7 H. L. Cas. 601. No better has the argument fared in our Supreme Court, when asserted in justification of injuries to property rights. ' A person cannot,' says Mr. Justice GORDON, in Pa. Lead Co's. Ap., ubi supra, ' claim immunity . . . . on the ground that . . . . his trade is a useful one and beneficial to the community, or to the nation, or that by bringing a large number of workmen into the community it has enhanced the value of the plaintiff's property.' ' There are many trades and many occupations which are not only reasonable but necessary to be followed, and which still cannot be allowed in the proximity of dwelling houses so as to interfere with the comfort of their inhabitants : ' Jessel, M. R., in Broder v. Saillard, L. R. 2 Ch. D. 692, 701, quoted and approved in Ladies' Decor. Art Club's Ap., 12 Cent. R. 377. The public usefulness of an enterprise ' is no reason why private right should

be infringed : ' ROGERS, J., in Howell v. McCoy, 3 Rawle, 256, 269. In Rhodes v. Dunbar, 57 Pa. 274, 295, the then chief justice enumerated twenty-nine useful establishments which, from time to time, had been declared nuisances. Doubtless, the development of industries and manufactures is a matter of concern to the public, in the furtherance of which the individual must put up with a reasonable degree of inconvenience inseparable from their prosecution. On the other hand, the right of every citizen of ' possessing and protecting property ' (Const. 1874, art. 1 § 1), and the preservation of the health and lives of the inhabitants of any neighborhood, are also matters of public concern, as opposed to which mere facilities for multiplying dollars and cents may be deemed insignificant. The requirement to surrender a portion of one's personal comforts in aid of public enterprise is a necessity to the existence of any civilized community. The requirement to surrender one's property, without adequate redress, for the benefit of the public would savor of a kind of socialism which finds no countenance in the constitution, laws or judicial decisions of this commonwealth. Of course, where, as in Com. v. Miller, 139 Pa. 77, the question is whether or not the defendant is guilty of the maintenance of a public nuisance as an offence against the public, considerations of the magnitude and importance of the enterprise, as measured by the capital invested in it and by its influence upon the prosperity of the community, are altogether legitimate. That is a public and not a private question to be viewed from the standpoint of the public, not of a private property owner, and the annoyance to the public on the one hand may properly be balanced by the benefits to the public on the other. But, as was decided in Sparhawk v. Ry. Co., the public aspect of a case before the criminal law has nothing to do with the private remedy in a court of equity.

" The application of these principles to the record before me lies upon the surface.

" Whilst the use made by the plaintiff of her property is the ordinary one to which property in that locality is put, viz. : farming and residence, the employment by defendants of theirs is not a ' natural use and enjoyment ' of it within the meaning of the phrase in Pa. Coal Co. v. Sanderson, 113 Pa. 126, 146. It is not an employment indicated as necessary or appro-

priate either by the natural resources or the surroundings of the place. The latter is, therefore, not a suitable or convenient one for this business, in the legal sense of those words, meaning ' not a place which may be convenient to the party himself, looking at his interest merely, but a place suitable and convenient when the interests of others are considered : ' Bamford v. Turnley, 3 B. & S. 65, 75, per WILLIAMS, J., quoted in Cooley, Torts, 597. The injury complained of does not arise from operations having any necessary relation to the nature or location of the land, but from substances artificially brought upon it and employed in a business which, carried on amidst surroundings similar to these, has been uniformly, in this and other states, held to be, or referred to, as a nuisance per se : Smith v. Cummings, 2 Pars. Eq. C. 92 ; Rhodes v. Dunbar, 57 Pa. 274, 286 ; New Castle v. Raney, 130 Pa. 546, 564 ; Czarniecki v. Bollman, 10 Cent. R. 96 ; Meigs v. Lister, 23 N. J. Eq. 199 ; State v. Luce, (Del.) 6 Cent. R. 862 ; Fertilizer Co. v. Malone, (Md.) 9 L. R. A. 737. Such being its character, there can be no pretence that the business is a ' lawful one.' Proof of the mere act is proof of the wrong : Ray, Neg. Imp. Dut. 14. Nor does the evidence leave its result in doubt. It was recently held, in State v. Neidt, (N. J.) 19 Atl. R. 318, that, when offensive smells compel citizens to retire from their porches and close their doors and windows, cause nausea and sickness of the stomach, produce retching and vomiting, and oblige them to forego their meals, a case of nuisance is made out. The condition of affairs thus stated very clearly describes what is proven to exist here. That the nuisance is not constant, but only when the wind is in one direction, is immaterial : Meigs v. Lister, supra ; it is not rare and exceptional within the meaning of Price v. Grantz, 118 Pa. 402, 413. That it sensibly diminishes the capacity of the plaintiff's property for ordinary use and enjoyment, and materially impairs its value by destroying physical comfort and menacing health, and is, therefore, actionable at law, cannot be reasonably questioned, being, indeed, involved in the declaration that it is a nuisance per se. That the injury is continuous and that, therefore, the remedy at law could not be made effective, except by a multiplicity of suits, is manifest. Hence, there is shown every element calling for equitable interference ; wrong, nuisance, and injury to property rights, irreparable at

law.   Neither, though this nuisance would seem clearly to be a public one, can it be pretended that the injury to plaintiff is not special, but such only as the public in general sustains. True, persons traveling on the nearby turnpike road and railway are nauseated and annoyed, much in the same manner as the plaintiff is in her dwelling, though, of course, not as frequently or continuously.   But the traveler is not thereby injured, as the plaintiff is, in his property rights, and no matter how many property holders besides her sustain a like injury to their properties, their injury is special to them and each of them as hers is special to her.   Equally irrelevant seems the fact that the injury proved is due to the escape of gases resulting rather from the use of chemicals in the manufacturing and drying purpose, than of highly putrid matter.   The former is fully within the allegations of the bill, nor is it easy to understand upon what theory an ascertained injury to land should be more justifiable, the proved deleterious effect of noxious vapors less objectionable, or recurring fits of vomiting more pleasurable, for the reason that these results caused by the admixture of chemicals were, in Fertilizer Co. v. Malone, supra, held to constitute an actionable nuisance.   Nor does equity defer the granting of relief until the complainant has been driven from his property: Fish v. Dodge, 4 Denio, 311 ; or until his health has been destroyed : Walter v. Selfe, 4 Eng. L. & Eq. 15, 22 ; or until somebody is killed : Dennis v. Eckhardt, supra, p. 393. I may conclude with the words of Mr. Justice THOMPSON in the last cited case, as entirely applicable to the present one : ' I do not forget the admonition against using the strong arm of the chancellor, but that strength was given, and intended to be used in proper cases, and I think this is one of them as it now stands before us.' "

*Errors assigned* were (1–5) dismissal of exceptions; (6) in not dismissing bill; (7) decree; quoting exceptions and decree respectively.

*C. H. Ruhl, Baer' & Snyder* and *Daniel Ermentrout* with him, for appellant, cited : Com. v. Miller, 139 Pa. 77 ; Huckenstine's Ap., 70 Pa. 106 ; Meckling v. Bridge Co., 1 Gr. 416 ; Wier's Ap., 74 Pa. 230 ; Dilworth's Ap., 91 Pa. 247 ; Richards's Ap.,

57 Pa. 105; Price v. Grantz, 118 Pa. 412; R. R. v. Lippincott, 116 Pa. 472; Robb v. Carnegie, 145 Pa. 340.

*Cyrus G. Derr, Henry C. G. Reber* with him, for appellee, cited: Czarniecki v. Bollman, 10 Cent. R. 96; Poynton v. Gill, Rolle's Abr. 140; and relied upon the opinion of the court below.

PER CURIAM, March 12, 1894:

We have examined the record with special reference to the specifications of error, and are not satisfied that either of them should be sustained. The findings of the material facts were fully warranted by the evidence; and they are quite sufficient to support the decree " perpetually restraining the said defendants, their workmen, agents, employees, successors and assigns from carrying on the manufacture and business as in said bill described," etc. If, as was suggested on argument, the defendant has since adopted new and improved methods of conducting its business, whereby the nuisance complained of has been abated, the court below will see that the parties are both protected in their respective rights. The injunction prohibits carrying on the manufacture and business " as in said bill described."

For reasons given at length in the report of the learned master and court below, we think the decree should be affirmed.

Decree affirmed and appeal dismissed with costs to be paid by appellant.