[Civ. No. 14513.   First Dist., Div. Two.   May 25, 1951.]

EARNEST L. HERBOLD, Respondent, v. GERALD HARDY et al., Defendants; HARDY THEATRES, INC., Appellant.

418

Maurice J. Bleuel and Paul Staniford for Appellant.

Granville T. Burke and Albert M. Hardie for Respondent.

GOODELL, J.—Respondent owns the property at the northeast corner of Piedmont and Linda Avenues in Oakland with a two-story building thereon.   The ground floor consists of

the "Piedmont" moving picture theatre and three stores. On the second floor there are five apartments, one of which is occupied by respondent.

On January 20, 1941, respondent leased the theatre to defendant Gerald Hardy for 15 years ending January 31, 1956. In 1946 Hardy assigned the lease to appellant Hardy Theatres, Inc., a corporation of which he is president.

The leased premises had been occupied before 1941 as a moving picture theatre, and over its entrance hung a marquee. In 1947 appellant contracted with a sign company for a new, modernized marquee, the installation of which gave rise to this litigation. Respondent's complaint prayed for an injunction compelling appellant to remove the new marquee and restore the place to its original condition, and for damages. From a judgment in respondent's favor this appeal was taken.

The old marquee had two wings, one parallel with the Piedmont Avenue face of the building, the other with the Linda Avenue face, each with two lines of letters. Connecting these wings, and running in a curve around the corner of the building above the theatre entrance was a central member or unit containing the name "Piedmont Theatre," the apex of which reached a little higher than the tops of the wings. However, no part of the marquee extended above the sills of the second story windows except said apex which was well out from the building and did not materially interfere with the windows.

After Hardy had decided on a new marquee he visited respondent, accompanied by the witness Davis, of the sign company, who brought pencil sketches or preliminary studies showing five different designs of marquees. This meeting was held in respondent's apartment on the corner of the building directly above the marquee. Respondent took his two visitors to the window, told them that the new marquee could come no higher than the window sills and for emphasis laid a yardstick across the sill. They acceded, stating that they would confine the wings to two horizontal lines of lettering (as in the old marquee) instead of three as planned.

The two wings were set in place without protest, since they were clearly below the sills. A gap was left between them, and when the central sign was hoisted into that space, temporarily suspended by ropes, it was evident that it would cover the corner windows. Respondent, under threat of using his shotgun, promptly ordered it down. It was left up, however, and when it was permanently affixed two or three police

officers stood guard over the operation and told respondent he would be ''run in'' if he interfered.

The court found that without respondent's consent and over his objection appellant affixed to the marquee ''a large vertical signboard approximately 10 feet x 20 x 3 feet in dimensions, and illuminating by seven bands of neon tubing, extending across the face of said sign and to the back thereof for approximately two feet'' which sign is directly in front of the corner windows ''and extending in height to approximately the top of said windows.''

The sign contains within its rectangular frame five horizontal lines to hold large letters displaying the names of moving pictures and the stars thereof, and is surmounted by the name ''Piedmont'' in still larger letters, faced with neon tubing. Extending out from each end of the sign are two arms, each carrying eight horizontal lines of neon tubing, curving around to the back of the sign.

Respondent testified that the sign has cut off about 25 per cent of his light and that the flashing on and off of the neon lights during three or four hours every night is extremely disturbing. Photographs taken from the apartment show the sign blocking the view from the corner windows. Respondent testified to other consequences but enough has been said to show that the use and enjoyment of the apartment have been seriously impaired.

The lease provides that ''Lessee shall have the right to erect upon the building suitable electric or other signs advertising the theatre business, but any damage caused by the erection or maintenance of such signs shall be repaired or paid for by Lessee.''

The court found ''That it is not true that said neon sign . . . was or is suitable for advertising the theatre business at said Piedmont Theatre within the meaning and terms of said lease . . .''

Appellant's counsel attack this finding, contending ''that the contract provided for the erection of signs in keeping with the advertising medium of other theatres *without reference to the particular building in question''* (emphasis added) and that any finding ''to the effect that the sign in question was not suitable in this sense, is not supported by the evidence.'' They argue that the parties ''intended 'suitable' to mean suitable for advertising in the competitive and specialized world of the theatre to which both lessor and lessee belonged.''

This position is untenable because such interpretation col-

lides head on with the principle that "One must so use his own rights as not to infringe upon the rights of another" (Civ. Code § 3514). The lease certainly gave the right to erect a new sign, but its language cannot be stretched to mean any and every type of sign as long as it is suitable for theatre advertising "without reference to the particular building in question" or the rights of others.

The inconsistency of appellant's position appears from its argument that "It is obvious that the parties did not mean *suitable to respondent, lessor*. If that were the interpretation, the provision would be a nullity and serve no purpose at all." (Emphasis added.)

Appellant introduced the photographs of signs and marquees on seven other Oakland theatres and draws a comparison between them and the Piedmont Theatre sign, to show that the latter was suitable *per se* as a theatre sign (wholly "without reference to the particular building in question"). Thus appellant claims that *suitability means suitability for itself, and its own purposes.*

It goes without saying that a sign might be a suitable one in the eyes of an advertising man or a theatre owner for their particular purposes, but it by no means follows that the same sign would be suitable where you have, as in this instance, a building devoted to several different uses. The court's decision indicates that it so concluded.

The word "suitable" has been held to be synonymous with "fit," "adapted to," "designed," "appropriate," "likely to suit," "convenient," "proper," "reasonable," (Words and Phrases, perm. ed., vol. 40, pp. 664-674).

In *Evans* v. *Reading C. & F. Co.*, 160 Pa. 209 [28 A. 702, 710] the court said: "The latter is, therefore, not a suitable or convenient one [place] for this business, in the legal sense of those words, meaning, 'not a place which may be convenient to the party himself, looking at his interest merely, but a place suitable and convenient when the interests of others are considered.' *Bamford* v. *Turnley*, 3 Best & S. 65, 75, per Williams, J., quoted in Cooley, Torts, 597" (followed in *Wellington* v. *Crowley* (1918), 230 Mass. 107 [119 N.E. 744].)

The language of the finding speaks as to suitability with relation to the situation "at said Piedmont Theatre" which, of course, is and must be the criterion, if the rights of the other occupants are to be given any consideration at all.

The court's interpretation was not only reasonable (Civ. Code, § 1643) but it gave the language its ordinary and pop-

ular meaning (Civ. Code, § 1644), and the meaning given in
*Evans* v. *Reading C. & F. Co., supra.*

■ Appellant contends that the theatre was to have a
position of dominance over the rest of the building. In doing
so counsel point to the description in the lease which, instead
of giving the theatre's own dimensions, gives the overall
boundaries of respondent's property (110′ x 103′) and then
excepts ''all store-rooms, flats and apartments.'' This was
probably the easiest way to do it but, after all, nobody claims
that anything more than the theatre was intended to be leased,
and the choice of such roundabout description does not tend
to prove any dominance.

Appellant points also to the covenant designed to prevent
the obstruction of the theatre's signs. This obviously is in
aid of the lessee's ''right to erect upon the building suitable
electric or other signs advertising the theatre business.'' How-
ever it indicates no intention to establish a dominance over
other occupants.

Lastly it is argued that the lease was to yield considerable
profit to respondent, the inference being that he was prepared
to sacrifice his own comfort and convenience in favor of the
theatre's signs. This is no more convincing than the other
two contentions.

■ Appellant's third point is that the changes were made
with respondent's consent and that an estoppel was proved,
since appellant expended for the sign and marquee $11,886.47
in reliance on such consent.

It is difficult for appellant to now argue that respondent
consented, since its counsel conceded in their opening state-
ment that the sign was put up under police guard. Counsel
then said ''Mr. Tracy gave us some protection and the sign
was installed over the objection of Mr. Herbold.'' Mr. Tracy
was chief of police.

Consent can hardly be based on the sketches exhibited at the
first meeting, since appellant failed to prove the allegations of
its answer that ''a detailed sketch and drawing showing the
width, depth and height'' of the sign and marquee was sub-
mitted to respondent. At that meeting the witness Davis,
representing the sign company, had six pencil sketches which
he characterized as ''thought studies'' or ''preliminary ideas''
representing five different designs. He admitted that the sign
as completed was not in accordance with any one of them.
It is true one of the sketches showed the proposed central
''Piedmont'' sign higher than the side wings, but there were

no dimensions thereon, and in the absence of figures or a scale drawing there was no way of telling how much higher it was to be, or where it would come with relation to the windows. Even without figures, a glance at the sketch shows the "Piedmont" sign nowhere near the height of the sign as completed. None of these "thought studies" pretends to be a detailed sketch, and accordingly the court found it to be untrue that "a detail sketch and drawing, showing the width, depth and height" of the sign and marquee was submitted.

█ Appellant assigns as error the exclusion of evidence of (a) the intention and understanding of the parties in regard to the language of the lease; (b) the negotiations prior to the execution of the lease, and (c) the surrounding circumstances which existed at the time of the negotiations and execution of the lease.

The lease, *which was drafted by an attorney then employed by appellant,* contains the clause: "Lessee shall have the right to erect upon the building suitable electric or other signs advertising the theatre business." If there had been any "intention and understanding of the parties in regard to the language of the lease" additional to or more specific than that clause, it certainly would have found its way into the lease itself since the same draftsman—not content to rely on section 1625 Civil Code—was careful to provide that "This lease supersedes any and all other and prior agreements of every kind and character heretofore entered into between the Lessors and the Lessee, and it is agreed that all of such prior agreements have been cancelled and rendered null and of no effect."

Moreover, when respondent's objections were sustained to the questions respecting negotiations, there was no offer of proof to enlighten the trial court as to what appellant expected to show (see 2 Cal.Jur. p. 275). And at the oral argument we still gave appellant's counsel an opportunity to point that out, but from their response it does not appear that parol testimony could have made any clearer "the intention and understanding of the parties" than does the lease itself which shows (in what the trial court thought, and we think, is clear language) the lessee's right to erect a new marquee provided it was suitable. Finally, the record *even as it stands* shows the surrounding circumstances. The premises already had been occupied as a theatre by another tenant, and the old marquee hung over the entrance; Hardy knew that the marquee had to be replaced

by a modern one; and the lessor was agreeable to that, provided it was suitable and did not obstruct the view. We find no merit in this point.

The only apparent conflict in this record arises from the conversation wherein respondent, at the window, told appellant and the witness Davis that the new marquee could come no higher than the window sills. There is testimony that respondent then expressed his indifference with respect to the central member or unit, but appellant himself testified that respondent "then outlined that the thing he wanted most was to keep his windows clear . . . I asked Mr. Herbold if it made any difference if it went a few inches above. He said, well, as long as it didn't interfere with his view." The central member is not only part of the marquee, but its most dominant part, extending, as found, "to approximately the top of said windows." It was for the trial court to determine as a question of fact whether, when respondent laid his yardstick on the window sill and spoke of interference with the view, he did not intend (and appellant did not understand him to intend) such limitation to apply *to every part* of the new marquee since no part of the old one (except the small apex) had reached above the sills, and since there would be no point in requiring the wings to be kept below the sills while at the same time permitting the central member to reach high above the sills and obstruct the corner windows. The court's finding that respondent did not consent, settled whatever conflict there was on this question.

The trial judge, on stipulation, viewed the premises. The photographs seem to give a clear idea of the situation, but whatever the judge saw on his own inspection might have given him impressions beyond those given by the pictures. Information so obtained "is independent evidence that can be taken into consideration in determining the issue of the case" (*Gibson Properties Co.* v. *City of Oakland*, 12 Cal.2d 291, 297 [83 P.2d 942]; see, also, *Noble* v. *Kertz & Sons etc. Co.*, 72 Cal.App.2d 153, 159 [164 P.2d 257] and cases cited) although there is no way of making it part of the record.

The prayer of the complaint was for $10,000 damages on the first count and $3,500 on the second; also for an injunction restraining defendants from maintaining, using and operating the sign, requiring them to remove it, and replace, repair and restore the marquee to its original condition.

The decree awarded no lump-sum damages but did award damages at the rate of $50 a month from June 17, 1947 (when

the sign was erected) until compliance with the judgment. The principal part of the decree is that "defendant is hereby ordered to remove said signboard and tubing within thirty days . . ."

Appellant contends that the court went too far in compelling the removal of the sign. However, the theory on which the case was prosecuted was that the sign constitutes a continuing nuisance and invasion of respondent's rights. There is no way in which the court can change the physical situation or abate the nuisance other than by ordering the sign's removal, and the lease has almost five years more to run. The court cannot modify the judgment by designing a new, "suitable" sign; it can say, and has adjudicated, that the present one is not suitable. It is true that a court should go no further than is necessary in such a situation, but it is difficult to see how respondent can get complete and adequate relief unless the sign be removed. The lessee still has the right to erect a suitable sign and it would appear that this must be done at its own peril unless the parties can reach an agreement, but that is something which the court cannot force or control.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.