[No. B090198. Second Dist., Div. Six. June 3, 1996.]

STEPHEN JORDAN et al., Plaintiffs and Appellants, v.
CITY OF SANTA BARBARA et al., Defendants and Respondents.

**COUNSEL**

Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares and Paul R. Minasian for Plaintiffs and Appellants.

Daniel J. Wallace, City Attorney (Santa Barbara), Janet K. McGinnis, Assistant City Attorney, David H. Hirsch, City Attorney (Lompoc), Price, Postel & Parma, Gary R. Ricks, Timothy E. Metzinger, Robert J. Gokoo,

DeCuir & Somach, Stuart L. Somach, Paul S. Simmons and Donald B. Mooney for Defendants and Respondents.

OPINION

STONE (S. J.), P. J.—Appellant landowners filed an action against respondent public agencies claiming that respondents' activities have increased the salinity of appellants' groundwater, thereby causing them to suffer crop losses and reduced land value. They also claimed that discharge of effluents into the river by sewage treatment facilities operated by respondents City of Lompoc and Vandenberg Village Community Services District caused excessive growth of vegetation in the river channel which caused potential flood problems. After an eight-week trial, the trial court ruled against appellants on all issues.

Appellants claim the trial court erred in refusing to find that the vegetative blockage of the flood control channel was a nuisance and constituted inverse condemnation, and that respondents' overpumping has increased the salinity and degraded the aquifers. They further challenge the court's ruling that respondents' use and diversion of water were reasonable and not contrary to law. We affirm the trial court's judgment.

PROCEDURAL HISTORY

Appellants own approximately 2,500 acres of agricultural land in the Lompoc plain, some of which is riparian to the Santa Ynez River. Respondents are the following public entities: the City of Santa Barbara (Santa Barbara), Montecito Water District (Montecito), City of Lompoc (Lompoc), and Park Water Company and its successor Vandenberg Village Community Services District (both to be referred to as Vandenberg).[1] Appellants pump groundwater from aquifers beneath their lands to irrigate and grow crops. They are the largest water users in the Lompoc Valley.[2] Respondents Santa Barbara and Montecito own and operate dams at the upstream or eastern end of the Santa Ynez River, diverting water for their constituencies' use on the south coast of Santa Barbara County. Respondents Lompoc and Vandenberg pump water from aquifers which underlie the Lompoc Valley and uplands

---

[1] The appeal against another public entity, Mission Hills Community Service District (Mission Hills), was dismissed upon stipulation of the parties.

[2] In 1985, their pumping accounted for 51 percent of the total water used in the valley for irrigation.

for use by their constituencies. These two respondents also own or operate sewage collection and treatment facilities. Appellants filed a complaint against respondents June 19, 1991. Appellants' third amended complaint on which the case was tried alleged that, commencing in 1974, they noticed that the water they pumped was becoming increasingly salty. They concluded that respondents, for various reasons, were responsible for the increased salinity. They alleged that due to excessive pumping of groundwater, Lompoc and Vandenberg have been "unreasonably interfering with and preventing the natural recharge of the aquifers, causing these aquifers to become saline and degraded in quality." They further alleged that a sewer treatment and disposal plant operated by Lompoc and to which Vandenberg contributes sewage adds salt and other deleterious chemicals to the water discharged to the Santa Ynez River channel, which enters the aquifer. They also alleged that the effluent released into the river causes vegetation, willow trees, bushes and shrubs to grow within the flood channel that block the flood-carrying capacity of that channel.

Appellants alleged that Santa Barbara and Montecito have violated rights adjudicated to them in *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673 [22 P.2d 5] (hereinafter *Gin Chow*). They alleged that Santa Barbara and Montecito have diverted more water than they had a legal right to take, thereby depriving the Santa Ynez River watershed of water that would have flowed into the river and thereafter into Cachuma Reservoir and through Bradbury Dam, to be available for natural recharge of the aquifers underlying the river watershed and appellants' lands. Appellants claimed to be damaged, and that future damage would result, due to their inability to grow crops as they previously had due to salination of and reduction in water quality. They also claimed that the quality and productivity of the soil have been damaged, thereby limiting the usability and suitability of lands for agricultural or domestic purposes.

The trial court sustained demurrers without leave to amend on appellants' eighth cause of action (dangerous condition of public property). The court also entered summary judgment on the 13th cause of action (writ of mandate based on Health & Saf. Code, former § 4034) in favor of California Department of Health Services and Lompoc, Vandenberg, and Mission Hills. The trial commenced July 5, 1994, and proceeded five days a week for eight weeks, involving hundreds of hours of testimony from experts and percipient witnesses and hundreds of exhibits. Upon stipulation of the parties, the court also visited the sites, including appellants' farming operations, and observed water measurements and pertinent physical features of the dams and river. August 29, 1994, the trial court granted Lompoc and Vandenberg's motions

for judgment, pursuant to Code of Civil Procedure section 631.8, concerning appellants' causes of action for trespass, private and public nuisance and inverse condemnation based on claims that respondents' discharges of salts, chlorides and other deleterious materials caused excessive salination and discharge of wastewater caused increased vegetation in the Santa Ynez River. November 29, 1994, the court entered its statement of decision disposing of the remaining issues.

In its statement of decision, the trial court noted that the evidence was "complex and in substantial conflict. The parties have introduced impressive expert testimony relating to the process and cause of salinization of water and soil, hydrology and hydro-geology of the Santa Ynez River and Lompoc basin aquifers, the effects of salt and diseases on plants, and related subjects. Expert opinions relating to the groundwater basins in question and their boundaries, dimensions, structure, geologic composition, and functioning are based largely on the interpretations and analyses of measurements, water samples, geologic logs, and other data obtained from many production wells drilled throughout the Lompoc Basin over the past sixty years and test wells drilled more recently."

The trial court summarized its decision as follows: "Defendants argue that plaintiffs have failed to prove any of their claims by a preponderance of the evidence. The court agrees that defendants have introduced substantial and more credible evidence that (1) the present condition of plaintiffs' water and soil pre-existed plaintiffs' acquisition in 1974; (2) salinity has increased only slightly since their purchase of their land; (3) plaintiffs have not sustained damage due to increased salinity; (4) the relief plaintiffs request, to have additional water for recharge as a barrier to intrusion of salts, constitutes an unreasonable use of water; (5) plaintiffs' own irrigation practices are the dominant causes of salinity and continuing salinization; (6) defendants' use of water is reasonable and lawful and is not a substantial factor in the salinization of plaintiffs' water and soils; and (7) that in any event plaintiffs' claims are barred by applicable statutes of limitations."

## DISCUSSION

### 1. *Standard of Review*

The trial court's decision is predominantly based upon questions of credibility, weighing conflicting evidence and drawing reasonable inferences from the voluminous evidence presented. Our role as a reviewing court is well known. ■ We resolve all evidentiary conflicts in favor of the prevailing parties, and indulge all reasonable inferences possible to uphold

the trial court's findings. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Our power " '. . . begins and ends . . .' " with a determination whether any substantial evidence exists, contradicted or uncontradicted, which will support the findings. (*Ibid.*) This court is without power to substitute its deductions for those of the trial court when the trial court could reasonably deduce two or more inferences from the facts. (*Ibid.*) The testimony of a witness, even though a party, may be sufficient to support the trial court. (*In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 163 [228 Cal.Rptr. 76].) Where, as here, the trial court has viewed the scene at the parties' request, information obtained " 'is independent evidence that can be taken into consideration in determining the issue of the case.' " (*Herbold* v. *Hardy* (1951) 104 Cal.App.2d 417, 424 [231 P.2d 910].)

The same standard of review applies to judgment given under Code of Civil Procedure section 631.8. This section authorizes the court to weigh evidence and make findings. (*County of Ventura* v. *Marcus* (1983) 139 Cal.App.3d 612, 615 [189 Cal.Rptr. 8].) In doing so, the court may refuse to believe witnesses and draw conclusions at odds with expert opinion. (*Ibid.*) Its grant of the motion will not be reversed if its findings are supported by substantial evidence. (*Ibid.*)

■ When appellants challenge the sufficiency of the evidence, all material evidence on the point must be set forth and not merely their own evidence. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact. (*Ibid.*) We will not disturb on appeal a ruling correct in law merely because it was given for the wrong reason. (*Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 [253 Cal.Rptr. 693, 764 P.2d 1070].) With these rules in mind, we will discuss specific evidence that bears upon the issues raised.[3]

2. *Lompoc and Vandenberg Are Not Liable for Increased Vegetation as a Possible Flood Hazard*

■ Appellants claimed that their property is devalued by Lompoc's discharge of treated wastewater into the adjacent river channel because it promotes the growth of vegetation which threatens to divert floodwaters

---

[3]The applicability of Civil Code section 3482 to bar appellants' nuisance claims, one of the trial court's alternative grounds in granting Lompoc's motion under Code of Civil Procedure section 631.8, would be reviewable de novo.

onto their lands. The court granted judgment to respondents Lompoc and Vandenberg under Code of Civil Procedure section 631.8 "on the grounds, *inter alia*, that the evidence does not prove the alleged conduct has caused damage or a cognizable nuisance or taking." The court also concluded that injunctive relief was inappropriate, given the parties before the court. Appellants claim the court erred because diverting water onto another's property is a nuisance and a trespass. (See *Weaver* v. *Bishop* (1988) 206 Cal.App.3d 1351, 1356-1357 [254 Cal.Rptr. 425].) They argue that if a public entity diverts natural stream waters onto a private owner's land and causes damage, the public entity must pay just compensation for this inverse condemnation. (See *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 337 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 637-638 [220 P.2d 897].) They also assert that the ultimate flooding or damage that may arise from trespass or nuisance need not have actually occurred at the time of trial for a remedy of injunction or damages.

The cases appellants rely on, however, discuss the difference between continuing nuisance and permanent nuisance where damage has already been inflicted and where the question is whether the plaintiff should have to file successive actions or sue for all damages, past, present and future. (See *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 271 [288 P.2d 507].) The commencement of the statute of limitations for a nuisance action varies, depending whether the nuisance is permanent or continuing. (*Wilshire Westwood Associates* v. *Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 744 [24 Cal.Rptr.2d 562].) Where the nuisance is abatable, it is deemed continuing, and persons harmed by it may bring successive actions for damages until the nuisance is abated. (*Ibid.*) On the other hand, where a nuisance is permanent, a single occurrence causes permanent injury, and a plaintiff must bring a single action for past, present and future damages. (*Ibid.*)

A "nuisance" is anything that "[i]s injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." (Wat. Code, § 13050, subd. (m)(1).) A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) An individual may maintain an action for a public nuisance if it is especially injurious to himself or herself. (*Id.*, at § 3493; *Newhall Land & Farming Co.* v. *Superior Court* (1993) 19 Cal.App.4th 334, 341 [23 Cal.Rptr.2d 377]; *Institoris* v. *City of Los Angeles* (1989) 210 Cal.App.3d 10, 20 [258 Cal.Rptr. 418].)

Pollution of water constitutes a public nuisance and water pollution occurring as a result of treatment or discharge of wastes in violation of Water Code section 13000 et seq. is a public nuisance per se. (*Newhall Land & Farming Co.* v. *Superior Court, supra,* 19 Cal.App.4th 334, 341; Wat. Code, § 13050, subd. (m)(3).) Where a nuisance is private as well as public, i.e., a disturbance of rights in land, the plaintiff does not have to suffer damage different in kind from that suffered by the general public. (*Newhall, supra,* at p. 342.)

Appellants' causes of action for private and public nuisance and inverse condemnation alleged that treatment and discharge of effluent into the Santa Ynez River channel causes a natural vegetation growth that blocks flood flows which "causes seepage and flood damage" to appellants' lands. Stephen Jordan testified that his objective was to obtain an order requiring Lompoc to discontinue or move, at least in part, its discharge. ▆ In California, an action for private nuisance cannot be maintained for an interference in the use and enjoyment of land caused solely by the fear of future injury. (*Koll-Irvine Center Property Owners Assn.* v. *County of Orange* (1994) 24 Cal.App.4th 1036, 1041-1042 [29 Cal.Rptr.2d 664].) Damage or injury has long been considered an essential element of a cause of action for nuisance. (*Helix Land Co.* v. *City of San Diego* (1978) 82 Cal.App.3d 932, 950 [147 Cal.Rptr. 683].)

Similarly, an action for inverse condemnation is generally available only where the taking results in property damage, other depreciation in market value, or unlawful dispossession of the owner. (*Olson* v. *County of Shasta* (1970) 5 Cal.App.3d 336, 341 [85 Cal.Rptr. 77]; see also *Los Osos Valley Associates* v. *City of San Luis Obispo* (1994) 30 Cal.App.4th 1670, 1679 [36 Cal.Rptr.2d 758].) Damage from invasions of water or other effluents often provides a basis for liability. (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 297 [142 Cal.Rptr. 429, 572 P.2d 43].) Physical damage is not invariably a prerequisite to compensation for inverse condemnation liability. (*Id.,* at p. 296.) However, "[t]he very definition of a 'taking' requires an 'act' . . . , and the risk of future flooding is not an act." (*Olson, supra,* at p. 341.)

The trial court concluded that Lompoc's operation of the waste treatment facility was authorized by a National Pollutant Discharge Elimination System (NPDES) permit issued by the State Regional Water Quality Control Board, therefore precluding liability for nuisance, trespass or taking. Civil Code section 3482 provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance."

Appellants assert that the permit and discharge standards issued to Lompoc do not specify that wastewater be utilized to maintain vegetative blockage in the river channel. They allude to Water Code section 13002, subdivision (e), that allows any person to maintain any appropriate action for relief against any private nuisance as defined in the Civil Code or for relief against any contamination or pollution. They point out that they did not seek a court order requiring respondents to discharge water at some other location in their third amended complaint. They did, however, allege that Lompoc and Vandenberg "have failed to cause treated waste water originating in their respective service areas to be returned to and discharged in areas which would directly recharge the cones of depression created by their groundwater pumping."

 Courts have circumscribed the exculpatory effect of Civil Code section 3482. (*Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285, 291.) The statutory immunity is available only where the acts complained of are authorized by the express terms of the statute or permit under which the justification is made, " ' ". . . or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury." ' " (*Ibid.*) Courts must scrutinize the statutes in question to ascertain whether a legislative intent exists to sanction a nuisance. (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 102 [160 Cal.Rptr. 733, 603 P.2d 1329].) In *Varjabedian,* the California Supreme Court found that none of the Government Code statutes under which the city claimed to act mentioned the possibility of noxious emanation from sewage disposal facilities. (20 Cal.3d at p. 292.)

 The pertinent Government Code sections (54309, 54309.1) authorize Lompoc to construct wastewater treatment and disposal plants for the purpose of "[t]he collection, treatment or disposal of sewage, waste or storm water, including drainage." (Gov. Code, § 54309, subd. (c).) State and federal law authorized issuance of an NPDES permit. (See Wat. Code, §§ 13225, 13263.) Section 13263, subdivision (a), provides that the regional board, "after any necessary hearing, shall prescribe requirements as to the nature of any proposed discharge, existing discharge, or material change in an existing discharge . . . with relation to the conditions existing in the disposal area or receiving waters upon, or into which, the discharge is made or proposed. The requirements shall implement any relevant water quality control plans that have been adopted, and shall take into consideration the beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, the need to prevent

nuisance, and the provisions of Section 13241." Section 13263, subdivision (e), allows any affected person to request revision of these requirements. The permit was issued over appellant Stephen Jordan's objections. When Jordan petitioned the State Water Resources Control Board (SWRCB) for review on the ground, inter alia, that the discharge caused the growth of vegetation in the river, the SWRCB dismissed the petition and Jordan chose not to petition for writ of mandate. (Wat. Code, § 13330.)

The permit specified that "[t]he discharge shall not contain biostimulatory substances in concentrations which promote aquatic growths that cause nuisance or adversely affect beneficial uses." It also set forth the maximum amount of constituents allowable in discharge. Appellants have not alleged that Lompoc is operating in violation of any standards imposed in their permit. Even though the discharge from the treatment facility performed as authorized by statute and permit may contribute to the growth of the vegetation, appellants cannot obtain relief by enjoining these respondents. It is beyond dispute that neither Lompoc nor Vandenberg is responsible for maintaining the riverbed. The task of clearing the riverbed of growth has fallen upon the flood control district. The evidence did not establish an exercise of control by respondents over either the flood control district or the riverbed. (*Locklin* v. *City of Lafayette*, *supra*, 7 Cal.4th 327, 370.)

In its natural condition, the Santa Ynez River contained willows and vegetation in the early 20th century and Lompoc has discharged effluents into the river since the early 1900's. Farmers periodically cleaned the channel to provide flood control along with Santa Barbara County up until the 1950's. The flood control district took over this function in the 1950's. The growth pattern in vegetation has accelerated since the mid- to late 1970's. The flood control district cleared a path with bulldozers every four to five years to maintain an average capacity of thirty-two thousand cubic feet per second in the river channel. However, the vegetation would regrow, slowing the flow before the next bulldozing.

The flood control district bulldozed the channel for the last time in 1983. When it planned to bulldoze again in 1987, it ran into regulatory resistance which became a "regulatory morass" by 1989. The Department of Fish and Game and other agencies required permits and compliance with other environmental measures that made clearance difficult and costly. The capacity of the river decreased due to this change in maintenance. Even so, a flow of 17,000 cubic feet per second passed through the channel in 1993 without a flood.

A dispute between the flood control district and the Department of Fish and Game became known as the "war of the willows" in the press. At that

time, Stephen Jordan became frustrated with the flood control district's inaction and threatened to sue it. In fact, the Department of Fish and Game ultimately sued the flood control district in 1992, the result of which allowed clearing of vegetation under the supervision of a biologist who was trusted by both the flood control district and the Department of Fish and Game. The flood control district used machinery to "mow" wide swaths in the river in 1992 and 1993, which has been sufficient to avoid flooding. However, after mowing, the plants grow back.

The flood control district is unable to clear the channel as it had in the past because it needs to provide eight acres of irrigated land in mitigation to replace willows that would be removed. The district does not have the water, the land, or the money to comply with all necessary regulations to maintain the channel. Mr. Demery, who operates the flood control district, testified that a plan for a long-term solution will have to meet regulatory demands and provide mitigation for environmental impacts.

Additionally, evidence before the court supports that other causes contribute to growth of vegetation. Appellants' hydrologist, Dr. Remson, testified that runoff from appellants' land contributes to growth of vegetation in the river. Also, the relatively high groundwater levels downstream of the treatment plant support deep-rooted plants. Appellants argue that if respondents' discharge causes increased vegetation, respondents cannot depend upon other entities to maintain the riverbed. Appellants, however, do not claim that Lompoc was responsible for past floods even though Lompoc has operated a facility to treat and discharge municipal wastewater for eight decades. They are concerned about an incremental increase in flood risk that could possibly cause a future flood.

Even if the court granted appellants an injunction to prohibit Lompoc's continued discharging of waste water into the channel, vegetative clearing would be needed to have greater flood control. Assuming Lompoc were assigned responsibility for the task, this project would necessitate involvement of the flood control district, the Department of Fish and Game, the Corps of Engineers, and the Environmental Protection Agency, none of whom was joined as a party. Even if Lompoc should have foreseen that proper operation of its wastewater treatment plant would increase vegetation in the riverbed, it could not reasonably foresee that changes in regulatory practices would so drastically impede usual measures to clean the channel. Thus, the court correctly ruled that it could not effectively grant injunctive relief, given the parties before the court. An injunction against Lompoc preventing continued discharge into the river would not guarantee prevention of major floods such as those in 1907, 1914, 1938 or 1969 which, in any event, scour the vegetation from the channel.

Moreover, appellants failed to prove damages or a taking. In discovery and at trial, appellant Stephen Jordan admitted that the willows which grow in the channel have not injured the day-to-day operation of the ranch property. He also admitted that he stated in discovery that there had been no direct overtopping of the levy. Seepage that had occurred was not in a planted area and did not cause monetary damage. No other appellant testified to damage from flooding. There is no evidence that flood damage causing injury to any of appellants' properties could be attributed to respondents' conduct, even assuming that Lompoc and Vandenberg contribute to the increased vegetation in the riverbed. The court properly concluded that risk of future flooding does not give rise to a claim for inverse condemnation. Any damages claimed by appellants are speculative.

Additionally, appellants have not shown that respondents have acted unreasonably in the discharge of water into the natural watercourse. (See *Locklin* v. *City of Lafayette, supra,* 7 Cal.4th 327, 337, 356-357, 366; *Belair* v. *Riverside County Flood Control Dist., supra,* 47 Cal.3d 550, 567.) ▮ For a public improvement to be liable in inverse condemnation, there must be a showing of " ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury." [Citations.]' " (*Belair, supra,* at p. 559.) The California Supreme Court has held that the reasonableness of the public agency's conduct is a factual determination based upon each individual case, considering the public benefit and the private damages in each instance. (*Id.,* at p. 566.)

Where discharge of surface waters by a public entity into a natural watercourse causes damage to downstream riparian property, the public entity may be liable in inverse condemnation if it acted unreasonably, i.e., failed to use reasonably available, less injurious alternatives, or turned the watercourse itself into a public work. (*Locklin* v. *City of Lafayette, supra,* 7 Cal.4th 327, 337-338.) ▮ Appellants failed to prove that respondents did either. Substantial evidence supports that appellants' property values were not diminished due to any actions by respondents, the potential for future flooding did not give rise to a cause of action for damages under a nuisance theory, and that appellants have suffered no actual harm or interference with the use of their properties due to increased vegetation or flooding.[4]

3. *Gin Chow Rights and Reasonable Use*

▮ Appellants sought injunction, contempt and other measures, including appointment of a watermaster, to assure passage downstream of the

---

[4]It is unnecessary to discuss the court's additional ground that appellants' causes of action were barred by the statute of limitations.

ordinary flows in the future. They assert that the trial court granted a higher priority water right to respondents and for greater amounts of water, rejecting *Gin Chow*'s determination of priority and which party must bear the costs of storage to conserve the infrequent flood, freshet and storm flows.

The Santa Ynez River begins near the eastern boundary of Santa Barbara County and flows 90 miles west and through a trough formed by 2 ridges of the coastal mountain range known as "the Narrows" before opening into the Lompoc Valley and into the Pacific Ocean. There are three dams on the river. Juncal, lying upstream, is owned by Montecito and is the smallest. Gibraltar, downstream from Juncal, is owned by Santa Barbara. Bradbury Dam, forming Lake Cachuma, is further downstream, 37 miles from the mouth of the Santa Ynez River and owned by the Bureau of Reclamation. It is the largest, and is operated under permits issued by the SWRCB. The capacities of all three dams have been reduced due to siltation. Additionally, Santa Barbara built a small diversion weir on Devil's Canyon, and Montecito constructed weirs on Alder and Fox Creeks to augment storage and diversion. Santa Barbara has continuously diverted additional water at Devil's Canyon Creek, a tributary slightly downstream of Gibraltar since before Gibraltar was completed, and Montecito has continuously diverted water from Fox and Alder Creeks, tributaries of the Santa Ynez River above Gibraltar, since 1934 and 1939, respectively.

By the turn of the century, Santa Barbara and Montecito were running out of water. In 1904, Santa Barbara, after giving lawful notice, appropriated water from the Santa Ynez River for the use of its inhabitants on the county's south coast and purchased dam and tunnel sites and watershed appurtenant to the Santa Ynez River, including lands appurtenant to Devil's Canyon Creek and the Gibraltar Reservoir and Juncal Reservoir sites. Santa Barbara completed boring Mission Tunnel in 1911 and completed the construction of Gibraltar Dam and Reservoir in 1920. The dam originally stored 15,374 acre-feet. Montecito was organized in 1921 to acquire water rights and construct works to increase the water supply necessary for its inhabitants. (*Gin Chow, supra*, 217 Cal. at p. 678.) Montecito acquired part of Santa Barbara's appropriative rights in 1926, out of which Montecito was required to transfer to Santa Barbara 300 acre-feet annually. This amount was the reduction in net yield of Gibraltar resulting from Juncal's construction. Since 1928 Montecito has owned and operated Juncal Dam and Jameson Reservoir about nine miles upstream from Gibraltar.

In 1928, a group of farmers in the Lompoc plain filed an action entitled Gin S. Chow v. City of Santa Barbara and Montecito County Water District,

No. 19188, in the Santa Barbara Superior Court, challenging Santa Barbara's and Montecito's water rights on the river. The trial court here had before it the California Supreme Court's opinion in *Gin Chow, supra,* 217 Cal. 673, the *Gin Chow* trial court's judgment, findings of fact and conclusions of law, and extrinsic evidence introduced to aid in interpretation of the judgment, including expert opinion.

The judgment in *Gin Chow* gave Santa Barbara the right by prescription to use 4,189 acre-feet, the greatest amount of ordinary flow ever diverted by Santa Barbara up to that time, and to store in Gibraltar Reservoir up to 15,374 acre-feet per year including the 4,189 acre-feet. Additionally, Santa Barbara was awarded the right to divert an additional 9,811 acre-feet per year from extraordinary flows, thus giving it a total of 14,000, inclusive of the prescripted 4,189. Of the stored water at Juncal Dam, Montecito could take 2,000 acre-feet per year from extraordinary flows, and from those appropriative rights it received from Santa Barbara, could transfer 300 acre-feet per year to Santa Barbara according to its agreement with Santa Barbara. The judgment also required that Santa Barbara release from Gibraltar 616 acre-feet during the summer and fall months until the ensuing rainy season, for the benefit of downstream users to assure that downstream users would continue to receive at least the amount of water they had received during the dry seasons since Gibraltar's construction. Raymond Hill, an expert at the *Gin Chow* trial, understood that the summer flow in the reservoir was simply passed in and out of the river as though the dam had not existed.

At the trial in *Gin Chow,* without waiving the benefit of any defense pled by the defendants, both Santa Barbara and Montecito disclaimed any intent to take ordinary and usual flow of the Santa Ynez River by means of Gibraltar Dam. (*Gin Chow, supra,* 217 Cal. at pp. 690-691.) Ordinary and usual flow "consists of such waters as flow therein independently of and not as a result of heavy rainstorms; that such heavy rainstorms and consequent freshets and torrential floods are not of regular, anticipated or usual occurrence and intervals of two years and more at times occur between said storms." (*Id.,* at p. 691.) The trial court's decision in *Gin Chow* came just after the 1928 adoption of article X, section 2 (formerly art. XIV, § 3) of the California Constitution, establishing the standard of "reasonable and beneficial use" of water.

In affirming the trial court, the California Supreme Court held that the doctrine of reasonable use set forth in the California Constitution modified

the law of riparian rights.[5] The Supreme Court in *Gin Chow* declared the importance that floodwater heretofore wasted into the sea be made available for beneficial uses and that ". . . the amendment purports only to regulate the use and enjoyment of a property right for the public benefit, for which reason the vested right theory cannot stand in the way of the operation of the amendment as a police measure. A vested right cannot be asserted against it because of conditions once obtaining." (*Gin Chow, supra*, 217 Cal. at p. 703.) The court further held that the plaintiffs' asserted right to have floodwater run without interception to the river was an unreasonable use. (*Id.*, at p. 706.)

Appellants assert that Montecito has operated, and continues to operate, Juncal Dam and the two additional diversion points, Fox and Alder Creeks, to divert substantial amounts of ordinary flows out of the watershed contrary to the court's order in *Gin Chow*. They assert that Santa Barbara has followed a similar pattern of diverting ordinary flows in excess of 4,189 acre-feet per year. According to appellants, increasing amounts of water above the 4,189 were diverted out of the watershed at Gibraltar Reservoir after the construction in 1952 of Bradbury Dam (Cachuma Reservoir) downstream by the Bureau of Reclamation. Bradbury Dam was to release downstream the amounts of water to which the downstream users were entitled for recharge purposes by implementation of a credit system from upstream inflows. Appellants contend that Santa Barbara's and Montecito's violation of restrictions upon storing and diverting ordinary and usual flows out of the watershed instead of restricting their use to flood flows compounded the shortfall of groundwater releases from Bradbury Dam for groundwater recharge after 1952.

The trial court acknowledged in its statement of decision that Santa Barbara has diverted more than 4,189 acre-feet in the years between 1933

---

[5]The amendment stated: " 'It is hereby declared that because of the conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than as much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; *provided, however*, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of deriving any appropriator of water to which he is lawfully entitled. . . .' " (*Gin Chow, supra*, 217 Cal. at pp. 699-700.)

and 1993 about half the time and that both Santa Barbara and Montecito admit that they store all inflows and do not distinguish ordinary from extraordinary flows. Both Gibraltar and Juncal Dams are operated on a fill and spill basis so that, except for Santa Barbara's summer and fall releases up to 616 acre-feet, releases occur in the form of spills when inflow overcomes capacity. In most years, these spills "probably exceeded the quantities of ordinary flow." The court found several reasons why the quantity of water reaching the narrows downstream was not in any substantial way diminished by the manner in which either Santa Barbara or Montecito exercised their diversion rights.

Specifically, the court found the following: 1) neither Santa Barbara nor Montecito has used more water than *Gin Chow* authorized them to use because amounts equal to or exceeding ordinary flow did in most years pass below the dams. 2) *Gin Chow* determined that these waters were surplus, of no use or benefit to the downstream users, and that the waters originating below Gibraltar Dam are sufficient in amount to serve all the beneficial uses of plaintiffs on their respective riparian lands, a finding which continues to be true. 3) Bradbury Dam, which impounds storm and flood flows and stores more than 190,000 acre-feet in Lake Cachuma, is ordered by the State Water Rights Board's decision of February 28, 1958, to release amounts of water at such times and rates "as will be sufficient, together with inflow from downstream tributary sources, to supply downstream diversions of the surface flow under vested prior rights to the extent water would have been available for such diversions from unregulated flow, and sufficient to maintain percolation of water from the stream channel as such percolation would occur from unregulated flow, in order that operation of the project shall not reduce natural recharge of ground water from the Santa Ynez River." 4) Santa Barbara's and Montecito's diversions do not harm appellants and are a reasonable and beneficial use of water. "Were Santa Barbara or Montecito required to divert less water, the resulting increased flows would be exhausted through evaporation, transpiration through phreatophytic consumption, and unnecessary storage in river gravels; the amount of water that would reach the narrows would be minimal." 5) Santa Barbara, Montecito and the Santa Ynez River Water Conservation District are parties to the "Upper Santa Ynez River Operations Agreement" dated August 1, 1989 (Pass Through Agreement) which compromised pending litigation and affected how Santa Barbara operates Gibraltar, including how it makes its summer and fall *Gin Chow* releases, an agreement that, "[f]or policy as well as legal reasons, plaintiffs should have no standing to here question" since it was "a far reaching compromise struck by plaintiffs' authorized representative. *See Coachella Valley County Water District* v. *Stevens* (1929) 206 Cal. 400, 410-411 [274 P. 538]."

The trial court concluded that, in light of the evidence and case law subsequent to *Gin Chow*, distinctions between ordinary, usual and customary flows and flood, storm, freshet and extraordinary flows are no longer required or meaningful.

Appellants argue that since 1914 and the adoption of the Water Commission Act, the only means of obtaining an extended, enlarged or higher priority water right is to apply to the SWRCB and obtain their permit and license which respondents have not done. They further assert that respondents could not acquire a prescriptive use that was "open and notorious" since the only method by which an appropriator can put downstream riparians or other appropriators on notice is to file an application for a permit. Moreover, according to appellants, due process requires that respondents or the court give notice to other water rights holders downstream if respondents are to be allowed to obtain additional water rights. According to appellants, the trial court wrongly interpreted case law subsequent to *Gin Chow* and has "freed" Santa Barbara and Montecito of their obligation to store floodwaters.

We reject appellants' challenges. For the most part, appellants argue their own interpretation of their experts' testimony and documentary evidence which was contradicted either expressly or impliedly by respondents' experts. At the trial in *Gin Chow*, as at trial here, the evidence showed that during most of each year and during many years in succession there is little or no surface flow at any point in the river. Water flows in the river under two circumstances, first, during and shortly after torrential downpours of rain, and second, in rare and unusual seasons when there is an extraordinary amount of rainfall of a gentle nature which is absorbed in and saturates the hills and mountains adjoining the river followed by heavy and continued rain storms. Most of the time the river has the character of a dry wash through which the runoff occurring during heavy storms is discharged and precipitated. Consequently, construction of dams is necessary to impound surface flows for later diversion.

The plaintiffs in *Gin Chow* took the position that they were entitled to have the entire flow pass undisturbed whether they were using the water beneficially or not. The trial court agreed with defendants that these flood or extraordinary flows would and could not be used by plaintiffs and were surplus to the amount that would be actually percolated into the gravelbed and recharge the underground supply to which plaintiffs' rights attached. (See *Gin Chow*, *supra*, 217 Cal. at p. 694.) The California Supreme Court held that the trial court's judgment was in keeping with the constitutional

amendment mandating reasonable use of water. "There is nothing novel about the limitation of the riparian right to a reasonable, beneficial use of water." (*Gin Chow, supra,* at p. 704.)

■ In *Meridian, Ltd., v. San Francisco* (1939) 13 Cal.2d 424, 449 [90 P.2d 537], the Supreme Court recognized that ". . . the storage of water for the purposes of flood control, equalization and stabilization of the flow and future use, is included within the beneficial uses to which the waters of the rivers and streams of the state may be put within the intent of the constitutional amendment." *Meridian* held that the first concern should be to recognize and protect the interest of those who have prior and paramount rights to the use of waters in the stream, but that the highest use is for domestic purposes, and the next highest use is for irrigation. (*Id.,* at p. 450.) "When demands on the stream for those and other recognized lawful purposes by riparians and appropriators are fully met and an excess of water exists, it is for the state to say whether, in the conservation of this natural resource in the interest of the public, the diversion is excessive." (*Ibid.*)

Appellants give undue emphasis to whether the waters taken by respondents are "ordinary" or "flood" waters. ■ The California Supreme Court recognized after *Gin Chow* that ". . . flood waters in a stream which can be put to a reasonably beneficial use by riparian owners on the stream are not subject to appropriation by an upstream claimant. On the other hand, if these flood waters are not being used by riparian owners and cannot be put to any beneficial use by them, then, under the doctrine of the Gallatin and Gin Chow cases, they are, to the extent that the riparian owners cannot put them to any beneficial use, subject to appropriation." (*Chowchilla Farms Inc. v. Martin* (1933) 219 Cal. 1, 38 [25 P.2d 435].) That case also held that in the vicinity of the Kings River, waters flowing during periods of high water were a part of the natural flow of the stream and could not be classed as either unusual, extraordinary or unexpected. (*Id.,* at p. 33.)

In the case before us, practically all water flowing in the river, except any that might enter from tributaries downstream from Gibraltar, would be "extraordinary" in a sense since the river is usually dry except during heavy rains normally occurring in the winter. Additionally, measuring "ordinary" flow is further complicated by the tributaries feeding through the mountainous terrain above the Gibraltar. Consequently, it is not surprising that the experts and operators of Gibraltar and Juncal had difficulty distinguishing between ordinary flow and extraordinary flow into and out of these dams. Essentially, what the California Supreme Court has discussed in the context of waters available for appropriation by nonriparian or nonoverlying users is

whether water is surplus to reasonable and beneficial uses of those with prior rights, such as downstream riparians.

██ The priority of a riparian or overlying user is limited and regulated constitutionally to reasonable beneficial uses present and prospective. (*Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 368 [40 P.2d 486].) "[D]istinctions heretofore made between the unusual or extraordinary and the usual or ordinary flood and freshet waters of a stream are no longer applicable." (*Ibid.*) The pertinent question is whether Montecito and Santa Barbara are reasonably using water which would not be of value to appellants. What is a reasonable use of water varies with the facts and circumstances of the particular case. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 354 [158 Cal.Rptr. 350, 599 P.2d 656].) Even riparian rights can be regulated and future unexercised riparian rights may be subject to lower priority over prior authorized appropriative rights. (See *In re Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448, 470-471 [243 Cal.Rptr. 887, 749 P.2d 324].)

██ More than two-thirds of the total runoff within the entire Santa Ynez River basin occurs below Gibraltar Reservoir. At trial in *Gin Chow*, it was found that no water intercepted and going through Doulton Tunnel to Montecito would ever, in its natural state, find its way into, or become part of the flow in the Santa Ynez River. Appellants contend that these respondents had to maintain reservoirs of the stated capacities in *Gin Chow* or construct additional reservoirs to be able to take the amount of water granted in *Gin Chow*. Not so. The trial court here correctly perceived that the intent was to grant Santa Barbara and Montecito permission to impound and store up to the prescribed amounts for their dams' safe yield purposes as the lack of storage capacity would otherwise deprive them of an assured source to draw from each year.

The area's hydrology in 1926 showed that the safe yield of Gibraltar Reservoir would be decreased by 300 acre-feet after Juncal Dam was constructed. Consequently, Montecito had to transfer 300 acre-feet to Santa Barbara as a part of Santa Barbara's transfer of the Juncal site. Due to siltation of Juncal Dam, the deprivation today would be less than 300 acre-feet per year. Additionally, William Mills, hydrologist and watermaster, testified that release of ordinary flow at Juncal would have constituted a waste of water. Mills also testified that *Gin Chow* was premised on there being sufficient water originating from the tributary area below Gibraltar to satisfy the needs for water in the Lompoc Basin, and that *Gin Chow* incorporated certain water management principles that maximize beneficial uses of water in the watershed and reduce waste of water to the ocean.

Hydrologist Barry Hecht testified that *Gin Chow* was based on the recognition that use of the Santa Ynez water resources was best achieved by impounding diversion of unpredictable winter runoff otherwise wasting to the ocean and allowing tributaries and the main system of the Santa Ynez River downstream of Gibraltar Dam to provide the runoff needed for downstream riparian use, plants and trees and recharge of the groundwater basin. Substantial evidence showed that Montecito did not exceed 2,000 acre-feet per year in the past 10 years and that prior to that time slightly exceeded it on 10 occasions out of 45 years.

Assuming that "ordinary" flow, as opposed to surplus or extraordinary or floodwaters, is still the operative rule under *Gin Chow*, the trial court was entitled to give more credence to respondents' experts that release of "ordinary" flow would not have inured to appellants' benefit due to evaporotranspiration, evaporation, seepage, the Cachuma Reservoir and other pumpers above the Narrows that would preclude this water from aiding in recharge of the aquifers. Moreover, the trial court correctly found that *Gin Chow* required release of water at Gibraltar, not to exceed 616 acre-feet, during the summer and fall months until the ensuing rainy season. Substantial evidence supports that Santa Barbara has adhered to this requirement. No other inflow release is required of Santa Barbara or Montecito and Santa Barbara does not have to account for flow that may not arrive at Gibraltar during the summer and fall due to operation of Juncal Dam. Based upon the testimony and evidence produced by respondents' experts, substantial evidence supports the trial court's conclusion that neither Santa Barbara nor Montecito used more water than *Gin Chow* authorized it to use.

Although appellants have selectively chosen the defendants in this lawsuit and excluded Cachuma Reservoir as a target, the trial court wisely concluded that the construction of a dam such as Bradbury was encouraged by the *Gin Chow* trial court to reduce the waste of floodwaters below the Gibraltar watershed. Its releases are to supply downstream diversions of the surface flow under vested prior rights to the extent water would have been available for such diversions from unregulated flow, and its operation is under continual study to improve service to all users. Substantial evidence supports the trial court's findings that appellants have not shown they are injured by the operations of Santa Barbara and Montecito, that *Gin Chow* was violated, or that the use of water by these respondents is unreasonable.

### 4. *Respondents Not Liable to Appellants for Any Increased Salinity in Groundwater Basin*

Appellants contend that diversion of water by Santa Barbara and Montecito and overpumping by Vandenberg and Lompoc have increased the

salinity of and caused degradation of the groundwater basin of the Lompoc plain. Again, they rely on their experts' opinions and disregard conflicting evidence. The established policy of the state is that use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation. (Wat. Code, § 106.) As indicated *supra*, ". . . superimposed on those basic principles defining water rights is the overriding constitutional limitation that the water be used as reasonably required for the beneficial use to be served. (Cal. Const., art. X, § 2.)" (*United States* v. *State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 105 [227 Cal.Rptr. 161].) This "rule of reasonableness" applies to both riparians and appropriators. (*Ibid.*) Vandenberg pumps approximately 1,400 acre-feet per year, approximately 5 percent of the total pumpage in the entire Lompoc Basin. It was uncontradicted that Vandenberg's net use of water is 860 acre-feet. Appellants' own expert, Dr. Remson, acknowledged that the affect of Vandenberg's pumpage, combined with that of Mission Hills, could not have caused problems on appellants' properties. Dr. Todd concluded that Vandenberg's pumpage is negligible and has no measurable effect on groundwater levels in the lower aquifer or main zone underlying appellants' properties. Appellants' theory was that pumpage by Vandenberg removed water from the aquifer that would have otherwise flowed beneath appellants' property thereby allowing salts in consolidated shales below the lower aquifer to migrate upward into the main zone where they would mix and degrade water quality. According to appellants, a hydraulic barrier should be maintained in the lower aquifer to push the shale salts back.

The trial court rejected these hypotheses as not proven by the evidence and, in any event, contrary to law. The California Supreme Court has long held that an appropriator of fresh water near an outlet of the sea has no right to insist that subsequent appropriators upstream leave enough water in the stream to hold back incoming tides and saltwater infusion. (*Antioch* v. *Williams Irr. Dist.* (1922) 188 Cal. 451, 465 [205 P. 688].) In *United States* v. *State Water Resources Control Bd., supra*, 182 Cal.App.3d 82, 110, the reviewing court held that the SWRCB has the broad powers and responsibilities in setting water quality standards, and the formulation of salinity levels to protect beneficial uses falls within its authorized function. The court extended *Antioch*'s rationale to riparian users and held that protection of a riparian's asserted right to salinity control would be unreasonable and a waste of water. (*Id.*, at p. 144.) Although appellants attempt to distinguish *Antioch* as applying between appropriators, we believe this distinction is not controlling under the constitutional doctrine of reasonable use. Use of upstream water to wash out salts downstream is an unreasonable use of water.

Salinity in groundwater in the Lompoc plain is not a new condition. It existed before appellants commenced their agribusinesses there in 1974 or even acquired the land for farming. Historically, the aquifers were recharged from seepage from the Santa Ynez riverbed, migration down from the Lompoc Upland, and drainage from the hills south of the valley. Significant recharge from San Miguelito, San Pasqual and Rodeo Creeks from the south was altered by the Soil Conservation Service when it diverted these creeks into concrete lined channels, taking the water directly to the river and eliminating much natural recharge.

George Goodall, longtime farm adviser in Santa Barbara County, testified about concerns dating to the 1950's with salinity and its effects on some crops. Workers on the farm at the time of its purchase observed salt residue on soils and were aware of concerns with groundwater quality. Appellants knew of high salinity levels in samples taken from wells and soils on their properties before they purchased.

Timothy Durbin, consulting engineer and former head of the United States Geological Survey in California, compiled over 2,000 water quality determinations from the Lompoc plain. Over a 40-year period, the average annual increase in total dissolved solids was 7 parts per million, and most of the increase occurred in the 1950's and 1960's. Durbin testified that the increase in salinity is exactly what one would expect from observations from other groundwater basins that supply irrigated agriculture and that the timing was consistent with other groundwater basins. Other experts (Scalmanini, Todd, Brownell) testified to the effects of intensification of farming on salinity, site-specific changes, and to the lack of a statistically significant increase in degradation or salinity since appellants purchased their properties compared to before that time.

Barry Hecht testified to only a slight increase in salinity in the western Lompoc plain in the 20 years since appellants purchased their property and did not identify any increase in the central plain. Dr. Brownell testified that appellants' soils were generally less saline than when the properties were purchased due to successful salinity management techniques. All experts agreed that salinity has increased significantly in the shallow zone of the upper aquifer into which all of the agriculture return flows find their way, bringing salts washed out of the growing zone. This shallow zone increase is leading to main zone contamination, particularly where appellants use high-capacity well pumps.

Substantial evidence shows that the salinity of appellants' groundwater is due to local factors and not to upstream diversion or pumping by respondents. Hecht and Timothy Durbin testified that the predominant source of

salt in the Lompoc plain is agricultural percolate. Even if pumping were less than recharge, there would still be salinity due to percolation of agricultural return water. Land leveling to increase efficient farming also releases more salts by disturbance of the shallow soil matrix. Abandoned water wells, of which there are hundreds in the Lompoc Valley, act as a conduit for the migration of highly saline waters of the shallow zone, as do oil and gas wells, including exploratory boreholes. Additionally, the aquifers of the valley outcrop to the ocean floor where sea water, heavier than fresh water, pushes fresh water out of the way.

Appellants counter that without salinization, appellants would still be entitled to judgment against the upstream diverters, and Lompoc and Vandenberg who are appropriators. They argue that recharge has declined and that there is overdraft in the Lompoc plain. Appellants apparently take the position that overdraft without injury, let alone injury from these respondents, entitles them to relief.

Overdraft exists when average annual withdrawals or diversions exceed the safe yield of a groundwater supply, i.e., the amount that can be used without leading to ultimate depletion of the supply. (See *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 278 [123 Cal.Rptr. 1, 537 P.2d 1250]; *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 929 [207 P.2d 17].) Here substantial evidence supports that recharge is sufficient to replace water being pumped, and that none of respondents is causing injury to appellants. Mr. Durbin analyzed 5,000 water level measurements from the United States Geological Survey. He testified that data showed that water levels in the Lompoc plain have essentially been unchanging since the 1950's. He also testified that if pumping within the Lompoc groundwater basin stays relatively constant, the groundwater levels will come to an equilibrium, and in the Lompoc plain that has essentially happened. Mr. Hecht concurred that water levels over the long term are stable and that there is no evidence of a regional drawdown or overdraft. Dr. Todd testified that overdraft exists in the combined Lompoc plain and upland related to agriculture. He stated there is no gradual lowering of water levels in the Lompoc plain. Mr. Scalmanini stated that the main zone of the Lompoc plain has relatively constant water levels.

Respondents' experts agreed that appellants' pumping had drained the upland aquifers relied upon by Vandenberg and Mission Hills, but none identified any long-term lowering of groundwater in the Lompoc plain. Moreover, there was also evidence of recharge to the groundwater from the Santa Ynez River throughout its length. Consequently, the trial court properly found that the quantity of recharge was not the problem. Salt load is the problem and irrigation is the dominant cause of salt load.

Substantial evidence supports the trial court's ruling that respondents have not overused water to the injury of appellants. As the trial court noted, many persons and entities use substantial quantities of water from the Santa Ynez River and Lompoc basin. In terms of acre-feet per year, the breakdown was as follow: appellants 11,000; Vandenberg 1,427; Mission Hills 595; Lompoc 4,500; Santa Barbara 4,500; Montecito 1,588; other users 46,000. Lompoc's per capita use is one of the lowest in the state and new users must pay to retrofit the system so they will not increase current consumption. Since 1989, the population of Lompoc has increased but the total water use has decreased by over 15 percent.

The court determined that considering their relatively low uses of water, their efforts to conserve, the nature of their beneficial uses and needs, and the statutory priority accorded to domestic uses under section 106 of the Water Code, uses of Vandenberg and Lompoc were reasonable. The court also found that the evidence failed to establish that the uses by these defendants jointly or severally constitute a substantial factor in the salinization of the western and central main zone of the upper aquifer.

Appellants contend that the court unfairly imposed upon them the burden of allocating damage among defendants. Again we disagree. ▮▮▮ "[I]n order to establish a causal connection between the public improvement and the plaintiff's damages, there must be a showing of ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury." [Citations.]' " (*Belair* v. *Riverside County Flood Control Dist.*, *supra*, 47 Cal.3d 550, 559.) Where a defendant is only one of a number of contributors to the acts alleged to have caused damages, it does not become a joint tortfeasor simply because afterwards its consequences united with the consequences of several other torts committed by other persons or entities. (*Slater* v. *Pacific American Oil Co.* (1931) 212 Cal. 648, 651 [300 P. 31].) For example, where one wrongfully pollutes a stream, he is responsible only for the actual damages sustained resulting from his own acts and not for damages caused by other persons who pollute the stream independently of his acts. (*Thorne* v. *Honcut Dredging Co.* (1941) 43 Cal.App.2d 737, 742 [111 P.2d 368].)

▮▮▮ Appellants also state that the court failed to explain why it did not enforce Water Code section 1245 which imposes liability upon municipal entities for damage caused to any property, business, trade, profession or occupation by a municipality's entry into a watershed for the purpose of acquiring or increasing a water supply. First of all, Vandenberg and Lompoc pump within the watershed and water pumped is either used within the

district boundaries and returned to the lower aquifer as recharge or transmitted to the waste treatment facility as sewage for treatment and release into the river channel where it recharges the Lompoc basin. More important, substantial evidence supports that appellants failed to prove *any* of these public entities legally caused appellants "injury, damage, destruction or decrease in value of any such property . . . resulting from or caused by the taking of . . . waters . . . ." (Wat. Code, § 1245; *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 146 [60 Cal.Rptr. 377, 429 P.2d 889].)

Nothing in the statute or the legislative history of the 1925 Reparations Act (see Wat. Code, §§ 1245-1248) indicates that this section creates strict liability or a separate cause of action. Section 1247 of the act denies the right to recover damages "directly or indirectly by reason of the construction, operation or maintenance of any conduit, pipe line, canal, ditch, aqueduct, reservoir, power transmission line or power house." Insofar as the Devil's Canyon Creek diversion, a public use had attached to waters being taken by Santa Barbara long before appellants purchased their land, and appellants' predecessors in interest never challenged it. (See *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 533 [45 P.2d 972]; *Miller & Lux Inc.* v. *James* (1919) 180 Cal. 38, 50-51 [179 P. 174].)

■ Appellants did not show at trial by a preponderance of the evidence that the difference between the pressure reduction and upwelling that they had caused themselves and the current salinity levels was a substantial legal cause of any damage to them. Nor did they show how much, if any, of this difference was reasonably allocated or allocable to each defendant. They seek to blame subsequent appropriators for the quality of their water, yet bought land with high salinity soils and water and have farmed it successfully. The mere showing of damage by a water shortage is not enough to justify relief. (*Orange County Water District* v. *City of Riverside* (1959) 173 Cal.App.2d 137, 216-217 [343 P.2d 450].) Upstream conduct imposes liability only with proof that it caused a substantial and specific proportion of damage attributed to that conduct. (*Locklin* v. *City of Lafayette, supra,* 7 Cal.4th 327, 343, fn. 11, 368.) A plaintiff in inverse condemnation must establish the proportion of damage attributable to the public entity from which recovery is sought. (*Id.,* at p. 372.) Appellants cannot show that Santa Barbara and Montecito's surface water diversions deplete the groundwater table, allowing infiltration and upwelling. Even assuming that their theory is supported by substantial evidence, the court would still have to find that the use by the public entities' dams, operating in the fashion in which they were intended, was unreasonable and their unreasonable conduct was a substantial cause of appellants' damages. (See *Locklin, supra,* at p. 367.) Appellants

failed to show that Montecito's and Santa Barbara's actions in operating their dams were a substantial factor in causing increased salinity and degradation of their groundwater.

We have considered all of appellants' arguments concerning the different grounds relied upon by the trial court. Even if appellants were not parties to the pass-through agreement, they requested a physical solution to their perceived problem. The court could consider, as expert evidence showed, that the Santa Ynez River Water Control Board was acting as a watermaster and that the agreement created a physical solution to meet the needs of downstream users to the extent they looked to upstream diversions for their needs.

The judgment is affirmed. Costs to respondents.

Gilbert, J., and Yegan, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 18, 1996.